**17D02-2301-PL-000001**

Filed: 1/3/2023 11:05 AM
Clerk

USDC IN/ND case 1:23-cv-00053-HAB-SLC document 6 filed 01/03/23 page 1 of 75

DeKalb Superior Court

DeKalb County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE DEKALB SUPERIOR COURT II |
| | ) SS: | |
| COUNTY OF DEKALB | ) | CAUSE NO. _____ |

| | |
|---|---|
| ISS LAND MANAGEMENT, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| THALASSA ENERGY PROJECT, LLC | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Comes now Plaintiff, ISS Land Management, LLC ("Plaintiff"), by counsel, and by way of its Complaint against Defendant, Thalassa Energy Project, LLC, alleges and states as follows:

### JURISDICTION AND PARTIES

1. Plaintiff is an Indiana limited liability company doing business in DeKalb County, Indiana.

2. Defendant, Thalassa Energy Project, LLC ("Thalassa") is a Texas limited liability company that entered into a contract regarding real property located in DeKalb County, Indiana.

3. This Court has jurisdiction pursuant to Indiana Trial Rule 4.4(a)(1), (2) and (5).

4. Venue is proper pursuant to Indiana Trial Rule 75(a)(2) and (5).

**Exhibit A**

## <u>FACTS</u>

5.      Plaintiff is the owner of real property in DeKalb County – DeKalb County Auditor Parcel Numbers:

  a. **15**-07-35-100-003;

  b. **15**-07-35-100-008;

  c. **15**-07-35-100-005;

  d. **15**-07-35-100-007;

  e. **15**-07-35-200-006;

  f. **15**-07-35-200-007; and

  g. **15**-07-35-200-005 (collectively, the "Real Estate").

6.      On or about April 22, 2021, Plaintiff and Defendant entered into a Lease and Purchase Agreement ("Agreement"). A true and accurate copy of the Agreement is attached as **Exhibit A** and incorporated by reference.

7.      Simultaneously with the execution of the Agreement, Defendant and Plaintiff executed a Memorandum of Lease Agreement ("Memorandum"), recorded in the Office of the DeKalb County Recorder as Document Number 202103428. A true and accurate copy of the Memorandum is attached as **Exhibit B** and incorporated by reference.

8.      Per the terms of the Agreement, Defendant was required to purchase a portion of the Real Estate within nine months of the effective date of the Agreement, or by January 22, 2022 that was described more fully in Exhibit B-1 to the Agreement and was approximately 5 acres.

9.    In addition, the Agreement provided for the possible lease of approximately 70 acres of the Real Estate by the Defendant, if the sale of the approximately 5 acres of Real Estate was accomplished by January 22, 2022.

10.    Section 2 of the Agreement expressly states that the "Sale must be exercised for the Lease to take effect."

11.    Defendant failed to purchase the sale portion of the Real Estate under Section 2 of the Agreement by January 22, 2022.

12.    As a result, the Agreement has expired and/or become void, since no sale or lease of the Real Estate may be exercised by the Defendant after January 22, 2022.

13.    Following the January 22, 2022 expiration of the Agreement, Plaintiff made multiple attempts to contact Defendant in an effort to have the Defendant execute and record a release of the Memorandum, currently on file with the Recorder's Office.

14.    Defendant has failed to take any actions to release the Memorandum on file with the Recorder's Office.

15.    Defendant is not in possession of any portion of the Real Estate.

16.    Plaintiff is in possession of the entirety of the Real Estate.

17.    Plaintiff is the fee simple owner of the Real Estate.

18.    The Memorandum currently clouds Plaintiff's title to the portions of Real Estate set forth in the Memorandum.

19.    Plaintiff has performed all of its obligations under the Agreement prior to the Agreement's termination.

3

## COUNT I: QUIET TITLE

20.     Plaintiff incorporates and re-alleges paragraphs 1-19 as if fully set forth herein.

21.     Section 2 of the Agreement granted Defendant the option to purchase uncertain portions of the Real Estate from Plaintiff during the Development Term (which is the period before the Construction Term).

22.     Pursuant to Section 2 of the Agreement, in the event Defendant exercised the option to purchase a portion of the Real Estate from Plaintiff, Defendant would have the right to lease additional portions of the Real Estate from Plaintiff to construct and operate a solar energy farm (the Construction Term and Operation Term being those lease periods beyond the Development Term).

23.     Importantly, Section 2 of the Agreement stated that "the Sale *must* be exercised for this Lease to take effect" (emphasis added).

24.     According to the Cover Page of the Agreement, incorporated into the Agreement pursuant to Section 20.4 of the Agreement, the Development Term with respect to the "Sale Property" was for a period of nine (9) months.

25.     The right to exercise the right to purchase the uncertain portion of Real Estate expired January 22, 2022.

26.     Defendant never exercised the right to purchase any portion of Real Estate.

27.     As a result of Defendant's failure to exercise the purported right to purchase, the Agreement terminated as the condition precedent to the commencement of the lease never occurred.

4

28.    Since the Agreement terminated, the Memorandum is null and void.

29.    Defendant has refused to execute a release of the Memorandum; therefore, intervention by this Court is required to grant Plaintiff relief from the cloud on Plaintiff's title to the Real Estate.

WHEREFORE, Plaintiff, ISS Land Management, LLC, by counsel, requests the Court adjudge and decree that the Agreement and Memorandum are null and void; adjudge and decree that Plaintiff is the fee simple owner of the Real Estate; award Plaintiff costs of this action; direct the Recorder's Office to release the Memorandum; and award any and all other just and proper relief in the premises.

### COUNT II:  DECLARATORY JUDGMENT – Statute of Frauds Invalidates the Agreement

30.    Plaintiff incorporates and re-alleges paragraphs 1-29 as if fully set forth herein.

31.    Under Indiana Code Section 34-14-1, et seq., Plaintiff files for a declaratory judgment as to the rights of the Plaintiff and Defendant with respect to the Real Estate and the Agreement.

32.    Pursuant to Section 2 of the Agreement, Plaintiff granted Defendant the right to purchase "approximately 5 acres of developed Property."

33.    "Property" is defined in the Agreement as all of Plaintiff's Real Estate described above, consisting of around 100 acres.

34.     Section 2 of the Agreement also conflictingly reads that Defendant has the right to purchase the "Sale Acreage," more particularly described on Exhibit B.1 of the Agreement.

35.     Exhibit B.1 lists "Sale Property," instead of "Sale Acreage" as all or portions of the following parcels of real estate:

      a.  **17**-07-35-100-004;

      b.  **17**-07-35-100-003;

      c.  **17**-07-35-100-007 (the most northerly 3.19 acres, more or less);

      d.  **17**-07-35-200-005 (1.5 acres, more or less, out of the most northeasterly portion); and

      e.  **17**-07-35-100-008.

36.     Importantly, all of the foregoing parcel numbers are invalid.

37.     Additionally, the descriptions of the real estate describing "the most northerly 3.19 acres, more or less" of Parcel 3 and "1.5 acres, more or less, out of the most northeasterly portion" of Parcel 4 do not adequately describe the boundaries of the purported real estate to be sold.

38.     The total acreage of the "Sale Property" listed on Exhibit B.1 is approximately <u>14.41 acres</u>, significantly more than 5 acres as set forth in Section 2 of the Agreement.

39.     Additionally, the Cover Page lists the "Sale Property" as only:

      f.  **17**-07-35-100-004;

      g.  **17**-07-35-100-003;

       h.  **17**-07-35-100-007 (the most northerly 3.19 acres, more or less); and

       i.  **17**-07-35-200-005 (1.5 acres, more or less, out of the most northeasterly

       portion).

40.    Thus, the Cover Page, which is incorporated into the Agreement pursuant to Section 20.4, completely exempts one of the parcels alleged to be sold.

41.    The Cover Page further describes the "Sale Acreage" as <u>10.11 acres</u>, more or less, the final calculation to be determined in the ALTA Survey; thus, the Cover Page description of the acreage is also significantly different than 5 acres in Section 2 and 14.41 acres in Exhibit B.1.

42.    Therefore, the real estate to be purchased by Defendant is uncertain and cannot be enforced by Defendant.

43.    "An agreement required to be in writing must completely contain the essential terms *without resort to parol evidence* in order to be enforceable." *Knapp v. Est. of Wright*, 76 N.E.3d 900, 907 (Ind. Ct. App. 2017) (emphasis added).

44.    "Under the Statute, an enforceable contract for the sale of land must be evidenced by some writing: (1) which has been signed by the party against whom the contract is to be enforced or his authorized agent; (2) which describes with *reasonable certainty* each party *and the land*; and (3) which states with reasonable certainty the terms and conditions of the promises and by whom the promises were made." *Id.* (emphasis added)

45.    The real estate to be sold according to the plain terms of the Agreement is not described with reasonably certainty.

46.     As a result, the Agreement is void and unenforceable under the Statute of Frauds.

47.     Pursuant to Section 2 of the Agreement, the sale must occur before Defendant had any right to lease other portions of the Plaintiff's Real Estate.

48.     Because the sale never occurred, and because the sale cannot possibly occur without some form of amendment to the Agreement (and because Plaintiff does not consent or wish to sell any portion of the Real Estate), the Agreement is terminated and the Memorandum is void.

49.     Defendant's refusal to execute a release of the Memorandum clouds Plaintiff's title to the Real Estate, which decreased marketability and value of the Real Estate, causing Plaintiff injury.

WHEREFORE, Plaintiff, ISS Land Management, LLC, by counsel, requests the Court adjudge and decree that the Agreement and Memorandum are null and void; adjudge and decree that Plaintiff is the fee simple owner of the Real Estate; award Plaintiff costs of this action; direct the Recorder's Office to release the Memorandum; and award any and all other just and proper relief in the premises.

### COUNT III: SLANDER OF TITLE

50.     Plaintiff incorporates and re-alleges paragraphs 1-49 as if fully set forth herein.

51.     The Memorandum is a statement made and published by Defendant regarding Plaintiff's title to the Real Estate.

52.     The Memorandum is null and void as set forth in the foregoing paragraphs.

53.     Pursuant to Section 20.10 of the Agreement, "Each Party shall, whenever reasonably requested by the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all conveyances, assignments, and all other instruments and documents as may be reasonably necessary in order to complete the transactions herein provided and to carry out the terms and provisions of this Agreement."

54.     Plaintiff reasonably requested Defendant release the Memorandum by letters dated March 2, 2022, April 14, 2022, May 23, 2022, and November 1, 2022. True and accurate copies of these letters are collectively attached hereto as **Exhibit C** and incorporated herein by reference.

55.     As a result of the termination of the Agreement and following Plaintiff's reasonable request to Defendant, Defendant had a duty to execute a release of the Memorandum in order to carry out Section 2 of the Agreement.

56.     Defendant's failure to release the Memorandum constitutes malice, since Defendant is aware that it has no interest in the Real Estate once the Agreement terminated on January 22, 2022.

57.     Defendant's refusal to execute a release of the Memorandum clouds Plaintiff's title to the Real Estate, which decreased marketability and value of the Real Estate, causing Plaintiff injury.

WHEREFORE, Plaintiff, ISS Land Management, LLC, by counsel, requests the Court adjudge and decree that Defendant slandered Plaintiff's title to the Real Estate;

award Plaintiff costs of this action, including attorney's fees, and award any and all other

just and proper relief in the premises.

Respectfully submitted,

CARSON LLP


/s/Eric M. Blume
Eric M. Blume  #29836-02
Logan C. Stevens  #36085-02
Attorneys for Plaintiff
301 W. Jefferson Blvd., Suite 200
Fort Wayne, IN 46802
Telephone:  (260) 423-9411
blume@carsonllp.com
stevens@carsonllp.com

**17D02-2301-PL-000001**
Filed: 1/3/2023 11:05 AM
Clerk
DeKalb Superior Court 2

USDC IN/ND case 1:23-cv-00053-HAB-SLC    document 6    filed 01/03/23    page 11 of 75
DeKalb County, Indiana

# LEASE AND PURCHASE AGREEMENT

By and Between

ISS LAND MANAGEMENT LLC

As Owner

and

THALASSA ENERGY PROJECT, LLC
a Texas limited liability company

As Lessee and Purchaser

APRIL___22___ , 2021

DEKALB COUNTY, INDIANA

     Exhibit A

1

## COVER PAGE

## LEASE AND PURCHASE AGREEMENT

| | |
|---|---|
| Effective Date: | April ___ 22, 2021 |
| Owner: | ISS Land Management LLC |
| Lessee: | Thalassa Energy Project, LLC |
| Leased Property: | Parcel Nos. 15-07-35-100-003, 15-07-35-100-004, 15-07-35-100-005, 15-07-35-100-007, a portion of 15-07-35-200-005, 15-07-35-200-007, and 15-07-35-200-006, more particularly described on Exhibit B attached hereto. |
| Leased Acreage: | 70.569 acres, more or less, the final calculation to be determined in the ALTA Survey |
| Sale Property: | Parcel Nos. 15-07-35-100-003, 17-07-35-100-008 the north 3.19 acres of parcel 15-07-35-200-007 and 1.5 acres, more or less, out of 15-07-35-200-005 more particularly described on Exhibit B.1 attached hereto. |
| Sale Acreage: | 10.11 acres, more or less, the final calculation to be determined in the ALTA Survey |
| Excluded Property: | 19.3 acres, more or less, of forested acres, as depicted on Exhibit B.2 attached hereto and made a part hereof, including Lessee built access road, the final acreage calculation to be determined in the ALTA Survey. |
| Development Term: | Sale Property:  Nine (9) months<br>Leased Property:  Eighteen (18) months. |
| Development Term Expiration Date: | The earlier of (1) the date that Lessee selects for the commencement of the Construction Term identified in the Construction Term Commencement Notice, or (2) the date Lessee notifies Owner that Lessee elects to terminate this Agreement pursuant to Section 2 of this Agreement. |
| Development Term Rent: | $10,000.00 one-time development term payment due and payable within 30 days of effective date |
| Purchase Price for Sale Acreage: | $800,000.00 pursuant to section 2.5.a |
| Construction Term: | The date specified in the Construction Term Commencement Notice pursuant to Section 2.6. |
| Operation Term Commencement Date: | The date specified the Operation Term Commencement Notice pursuant to Section 3.1. |
| Operation Term Expiration Date: | The day preceding the Thirty-fifth (35th) anniversary of the Construction Term Expiration Date pursuant to Section 3.1. |
| Construction and Operation Term Rent: | Set forth on Exhibit D attached hereto starting at $750/acre/year |

## LEASE AND PURCHASE AGREEMENT

This Lease and Purchase Agreement (this "**Agreement**") is entered into as of the date on which the last Party has executed this Agreement (the "**Effective Date**"), by and between ISS Land Management LLC (hereinafter "**Owner**"), and Thalassa Energy Project, LLC, a Texas limited liability company ("**Lessee**"), and in connection herewith, Owner and Lessee agree, covenant and contract as set forth in this Agreement. Owner and Lessee are sometimes referred to in this Agreement as a "**Party**" or collectively as the "**Parties**".

## RECITALS

WHEREAS, Owner holds a fee simple interest in that certain real property located in DeKalb County, State of Indiana, more particularly described on **Exhibit B (Leased Property) and B.1 (Purchase Property) and excluded property with access road as depicted on Exhibit B.2 (Access Road to be constructed by Lessee at no cost to Owner for their continued use of the retained wooded area)** attached hereto and incorporated herein by reference (the "**Property**").

WHEREAS, Lessee desires to lease all or a portion of the Property as described on Exhibit B and to sell a portion of their property as described on Exhibit B-1 for solar energy purposes, and throughout the term of this Agreement, Lessee shall have the sole and exclusive rights to use the Property for solar energy purposes, including, without limitation, solar resource evaluation, solar energy development, converting solar energy into electrical energy, collecting and transmitting the electrical energy converted from solar energy, including sub-contractors to create the communication infrastructure, energy storage purposes, and electric power, heat and/or steam generation, and any and all other activities related to the foregoing and to convert all of the solar resources of the Property, together with any and all activities related thereto, including, without limitation, constructing, installing, using, replacing, relocating and removing from time to time, and maintaining and operating Solar Facilities. (the "**Purpose**").

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, the receipt and sufficiency of which are acknowledged, Lessee and Owner hereby agree to and intend to be bound by the foregoing recitals and as follows:

## AGREEMENT

1. **Grant of Lease**. Owner hereby leases to Lessee a minimum of 70 acres of the Property solely and exclusively for the Purpose, pursuant to the terms and conditions of this Agreement. Concurrently with execution of this Agreement, Owner and Lessee shall execute and notarize the Memorandum of Agreement in the form attached as **Exhibit E** hereto (the "**Memorandum**") and shall record such Memorandum in the Office of the DeKalb County Recorder's Office as promptly as reasonably possible.

2. **Grant of Sale.** Owner hereby agrees to Sell to Lessee approximately 5 acres of developed Property solely and exclusively for the Purpose, the Sale must be exercised for this Lease to take effect. Should Lessee elect to proceed with leasing any portion of the Property pursuant to Section 1, as a condition precedent to the commencement of the Construction Term, Owner shall sell to Lessee, and Lessee shall purchase from Owner, the Sale Acreage, which is more particularly described in Exhibit B.1, by the execution of a mutually agreed to form of Warranty Deed to be executed by Owner upon receipt of payment from Lessee.

3. **Development Term**.

3.1     Development Term. The development term (the "**Development Term**") of this Agreement commences on the Effective Date and shall end with respect to the Property (or an applicable portion thereof) on the earlier of (i) the date that Lessee selects for the commencement of the Construction Term for any portion of the Property (any such property shall be referred to herein as the "**Leased Premises**") identified in a written notice delivered to Owner per the definition of Section 2.6 (ii) the date Lessee notifies Owner that Lessee elects to terminate this Agreement with respect to any portion of the Property identified in a written notice delivered to Owner ("**Termination Notice**. Lessee may deliver a Termination Notice on one or more occasions during the Development Term in relation to various portions of the Property. Upon delivery of a Termination Notice, Lessee shall have no further rights and obligations hereunder with respect to such terminated portion of the Property. Lessee shall promptly record a memorandum reflecting the termination of the Agreement with respect to the portion of the Property described in any Termination Notice.

3.2     Development Term Purpose/Activities. During the Development Term, Lessee will determine the feasibility of solar energy conversion and power generation on the Property. This determination will be based upon a variety of factors, including Lessee's ability to obtain necessary permits and interconnection and power purchase contracts required for constructing and operating a solar generation facility (or facilities) on the Property. In furtherance of Lessee's feasibility activities, Lessee and its representatives, agents, and contractors shall have the right to enter onto the Property to conduct studies and inspections to evaluate the Property and determine the feasibility of solar energy conversion and power generation on the Property, including, without limitation, the right to conduct the studies and inspections referred to in this Section 2.2; provided that Lessee shall provide Owner with not less than 48 hours of advance notice of the dates Lessee contemplates that Lessee and/or its representatives, agents, and contractors are planning to enter upon the Property for such purposes. In addition to this advance notice, Lessee and/or its representatives, agents, and contractors shall call Landowner at 260/645-0289 no less than 30 minutes before arrival so the dogs can be penned. Such right of entry shall include, but not be limited to (1) the right to conduct geotechnical, biological and cultural resource investigations; (2) the right to install solar monitoring station(s) and to conduct studies of the solar energy emitted upon, over and across the Property and gather other meteorological data; and (3) the right to conduct Phase I and Phase II environmental site assessments. To assist Lessee's feasibility review, Owner shall reasonably cooperate with Lessee. If Lessee determines, in its sole and absolute discretion, that it will not be feasible to use all or a portion of the Property, Lessee may terminate this Agreement with respect to all or a portion of the Property at any time prior to the expiration of the Development Term pursuant to Section 2.1.

3.3     Owner's Use of the Property. During the Development Term, Owner may continue to use the Property for agricultural, ranching, timber harvesting, and/or other reasonable purposes; provided, however, Owner shall not (i) materially change the Property, (ii) modify or extend any existing leases or other agreements relating to the Property without Lessee's prior written consent, or (iii) grant or permit any easement, lease, license, right of access or other possessory right in the Property to any third party which could materially adversely affect the Purpose, without the prior written consent of Lessee. Lessee shall allow Owner the time necessary to harvest their existing crop or, if time does not permit, compensate Owner for the fair market value of the crop.

3.4     Acreage. Lessee shall, at its cost and expense, conduct an ALTA survey of the Leased Premises (the "**Survey**") prior to the installation or construction of Solar Facilities thereon. The Survey shall specify the gross acreage of any Access Property (as hereinafter defined) and Net Acreage of the Leased premises (which shall be not less than 70 acres) and will show all easements, encroachments and

other matters affecting the Leased Premises. The exact number of acres comprising the Leased Premise shall be determined prior to the commencement of the Construction Term, based on the results of the Survey. For the purpose of calculating the Construction Operation Term Rent, the total acreage comprising the Property shall include only the Leased Premises. During the Development Term. Lessee may, at its sole cost and expense, subdivide the Property subject to prior written approval (which approval shall not be unreasonably withheld, conditioned or delayed) of Owner. Owner agrees to cooperate with Lessee in this regard to the extent reasonably requested.

3.5          Construction Term.     The construction term (the "Construction Term") shall commence with respect to the Leased Premises" identified in a written notice delivered to Owner via FedEx, UPS or certified mail (the "**Construction Term Commencement Notice**") a minimum of 90 days prior to the commencement of the Construction Term.

2.5.a. Purchase Property. Lessee shall pay Owner a fixed rate of $800,000.00 for the property described on Exhibit B-1 within the term listed on the Cover Sheet.

4. **Operation Term**.

4.1      Operation Term. The operation term of this Agreement (the "**Operation Term**") shall commence with respect to the Leased Premises upon the Operation Term Commencement Date identified in a written notice delivered to Owner in accordance with Section 19.3 (the "Operation **Term Commencement Notice**") a minimum of thirty (30) days of the commencement of the Operation Term and shall continue thereafter until the day preceding the Thirty-fifth (35th) anniversary of the date that the facility commences to generate power (the "**Operation Term Expiration Date**"). Lessee may upon providing ninety (90) days prior written notice to Owner, and without requiring Owner's consent, terminate this Agreement at any time prior to the 35th Anniversary of the Operation Term Commencement Date (in the event of such termination, Lessee shall comply with Section 16 of this Agreement). In the event that Lessee terminates this agreement prior to the 21st year of this Operation Term, Lessee will be obligated to make a one-time compensation payment for early termination to Owner in the amount of $350,000.00.

4.2      Extension Options. Lessee shall also have up to three (3) extension rights, upon written notice to Owner at least one hundred eighty (180) days prior to the expiration of the Operation Term and/or the first Extended Term (as hereinafter defined), as applicable, to extend the Operation Term for three (3) additional periods of five (5) years on each such occasion (each, an "**Extended Term**"). The Development Term, together with the Operation Term and any Extended Term shall be referred to herein collectively, as the "**Term**".

4.3      Operation Term Rights. During the Operation Term and any Extended Term, Lessee shall have the exclusive right to use and possess the Leased Premises and for the Purpose and to derive all profits, rents, royalties, credits and profits therefrom. Lessee's rights with respect to such Property during its Operation Term and any Extended Term shall also include the following rights:

(a)      Access and Utility Easement. Owner also grants to Lessee non-exclusive, appurtenant easements on, under, over, across and through portions of the Property during the Operation Term and any Extended Term for Lessee and its employees, contractors, subcontractors, agents and assignees to use portions of the Property, in the locations designated in the Operation Term Commencement Notice, to (i) provide ingress and egress to the Leased Premises at all times on a 24-hours-a-day, 7-days-a-week basis by means of roads and lanes thereon if existing, or otherwise by such

reasonable route or routes as Lessee may designate from time to time, and (ii) permit Lessee to occupy, develop, design, engineer, construct, access, monitor, install, own, operate, maintain, repair, replace, improve and remove at all times on a 24-hours-a-day, 7-days-a-week basis utility and communication infrastructure, including without limitation poles, supporting towers, guys and anchors, fibers, cables and other conductors and conduits, and pads, transformers, switches, vaults and cabinets, and related equipment to connect the Solar Facilities to the local electric distribution system, together with the right of access to the utility infrastructure over the Premises, for any purpose reasonably connected with the Solar Facilities utilities by means of transmission lines and infrastructure (the "**Access and Utility Easements**"). If Lessee later determines in its reasonable discretion that any additional Access and Utility Easements across the Property are necessary, useful or appropriate for the construction and operation of the Solar Facilities, Owner shall reasonably cooperate, after review and approval of the portion of the Property on which the proposed easements will be located, in granting or agreeing to such reasonable and necessary easements by amendment to this Agreement or by separate agreement and recordation of same. The Property utilized for purposes of the Access and Utility Easements shall be referred to herein as "**Access Property**". Owner shall have the nonexclusive right to continue to use such Access Property in any manner which does not interfere with Lessee's use thereof for the purposes permitted pursuant to the Access and Utility Easements.

(b)     Solar Easement.  Owner shall not (and shall not allow any other party to) disturb or interfere with the unobstructed flow of solar energy upon, over and across the Property, whether by placing towers or antennas of any type, planting trees or constructing buildings or other structures or facilities, or by engaging in any other activity on the Property or any real property adjacent to the Property that is owned or controlled by Owner, if any (the "**Remainder Property**") that might delay the installation of, disrupt, or otherwise cause a decrease in the output or efficiency of the Solar Facilities. In furtherance thereof, Owner hereby grants and conveys to Lessee and its successors and assigns the exclusive easement to the free and unobstructed insolation of solar energy on, about, above, under, through and across the Property, including over the entirety of the horizontal space and the entirety of the vertical space lying above the surface of the Property and that portion of any Remainder Property contiguously situated around the Property (if any) for the benefit of the Property (collectively, the "**Solar Easements**"); provided Owner shall have the continued right to use the Remainder Property for any uses existing as of the Effective Date and any new uses which are wholly consistent with the requirements of Section 9.8.

The Solar Easements granted by Owner in this Agreement are easements in gross for the benefit of Lessee and its successors and assigns, as owner of the Solar Facilities. Upon Lessee's request, Owner shall execute recordable instruments evidencing the Easements (the "**Solar Easement Instruments**").  Except as otherwise expressly set forth in the Solar Easement Instruments, the Solar Easements shall terminate contemporaneously with the expiration of this Agreement.

(c)     Improvements Affecting the Solar Facilities. During the Construction and Operation Term and any Extended Term with respect to any Property, Owner shall not (i) light any fires within fifty (50) feet of the Property or any Solar Facilities, (ii) place or store any flammable materials (other than growing agricultural crops), or allow to exist any such flammable materials within fifty (50) feet of the Property or any Solar Facilities, or (iii) construct or permit to be constructed any improvement, structure, embankment, impediment, berm, wall, fence or other object, on or that intrudes (or could intrude) into the Property that could obstruct, interfere with or impair, or create a hazard or risk of damage to the Solar Facilities or the use of the Property by Lessee hereunder.  Lessee may, as reasonably necessary and in the sole judgment of Lessee, remove,

trim, prune, top or otherwise control the growth of any tree, shrub, plant or other vegetation (other than growing agricultural crops); dismantle, demolish, extinguish, and remove any such fire, flammable material, improvements, structures, embankments, impediments, berms, walls, fences or other objects that could obstruct, interfere with or impair, or create a hazard or risk of damage to the Solar Facilities or the use of the Property by Lessee hereunder."

(d)    Existing Structures. Lessee may occupy, use, renovate, rebuild, demolish, and/or remove any existing structures on the Leased Premises as it deems necessary, useful or appropriate in relation to the Purpose, including utilizing existing structures as an office and/or living quarters in connection with construction, operation, and management of the Solar Facilities. In addition, Lessee may remove and/or relocate any fencing previously installed on the Leased Premises, at Lessee's cost and expense, as may be necessary, useful or appropriate to accommodate the construction and/or operation of the Solar Facilities.

(e)    Right to Control Access. Subject to the terms of this Agreement and applicable law, during the Operation Term and any Extended Term with respect to any Property, Lessee shall have the right under the Agreement to control and restrict access onto and over such Property and exclude others (other than any parties with preexisting easement rights of record or other rights approved by Lessee), and Lessee will construct and maintain security devices on such Property which Lessee deems appropriate and necessary for the protection of the Solar Facilities, including, but not limited to, any type of fencing, security monitoring or other security safeguards. Nothing in this Section 3.3 shall be construed to require Lessee to repair, maintain or replace any fence existing on such Property on the Effective Date or any other fences erected, with Lessee's permission, by Owner on such Property thereafter.

4.4    Owner Access. During the Operation Term and any Extended Term, Owner shall have the right to inspect the Leased Premises at reasonable intervals and at reasonable times upon at least forty-eight (48) hours' prior advance written notice to Lessee. Any such access shall not materially interfere with Lessee's use and occupancy of the Leased Premises in any manner. Owner shall abide by Lessee's site/safety policies in connection with same.

4.5 Water and Sewage.

(a) Owner shall retain all water rights, interest, and claims appurtenant and/or related to the Leased Property, provided Lessee shall be entitled to use all available water from the Property as necessary for the term of this Agreement. If determined necessary by Lessee, any improvements to an existing well will be at Lessee's sole cost. Owner shall be compensated for Lessee's water use on a monthly basis at the rate published by the local USDA. All improvements, once installed, shall become the Owner's property.

5.    Mineral Rights. Owner shall retain any and all interest in and to the minerals of every kind and character, including, but not limited to, oil, gas, sand, dirt and gravel in, on and under the Leased Property, provided that Owner must comply with Section 9.8, below, at all times. The Parties further agree and consent that: (i) during the Development Term, Owner shall not subsequently enter into any oil, gas, and/or mining lease and/or permit an oil, gas, and/or mining operator to commence drilling and/or mining operations on and within the surface of the Property without first obtaining the written consent of Lessee, which may be withheld in Lessee's reasonable discretion; and (ii) during the Operation Term, Owner shall solely and exclusively utilize the areas outside of any fenced (or to-be fenced) Solar Facilities to explore and produce the minerals on and/or under the Property. During the Operation Term,

7

Owner (and/or any of Owner's subsequent mineral lessees) will not have surface access to drill and/or mine directly under the fenced (or to-be fenced) Solar Facilities, although Owner (or any of Owner's subsequent mineral lessees) is permitted to fully explore for minerals under the Solar Facilities from off-Property surface locations via horizontal drilling methods at depths no less than 500 feet below the Property surface. Owner (or any of Owner's subsequent mineral lessees) agrees to conduct all mineral operations on any lands in the vicinity of the Property in a manner so as not to damage the Solar Facilities or other improvements constructed on the Property, and to use good faith efforts to assure that any and all future oil, gas, hydrocarbon or mineral leases executed by Owner require that the lessee under such oil, gas, hydrocarbon or mineral leases agree to comply with such covenant and agreement regarding mineral operations. At its discretion, Lessee may seek executed waivers from each party owning or leasing a mineral interest underlying any portion of the Property the development of which might interfere with Lessee's rights under this Agreement by each such mineral owner or lessee, on terms reasonably satisfactory to Lessee. Owner will use reasonable efforts to cooperate with Lessee in such efforts.

6.  **Payments**. The Development Rent and Operating Rent are referred to herein collectively as the "**Rent**".

6.1    Development Term. Lessee shall pay to Owner as Rent during the Development Term the amount set forth on the Cover Page (the "**Development Term Rent**"). If the Development Term ends with respect to all or any portion of the Property on any day other than the end of a Development Rent period, Development Rent paid for the portion of such period after the expiration of the Development Term for such Property shall be credited to payments due during the Operation Term for such Property. The Development Term Payments are non-refundable in the event that this Agreement is terminated.

5.2    Construction Period. Lessee shall pay to Owner as Rent on the Leased Property during the construction period the amount set forth on Exhibit D.

5.3    Operation Term and Extension Terms. Lessee shall pay to Owner as Rent on the Leased Property during the Operation Term the amount set forth on Exhibit D (the "**Operation Term Rent**").

7.  **Ownership of Solar Facilities**. The Solar Facilities are personal property, whether or not the same is deemed real or personal property under Applicable Law and shall not attach to or be deemed a part of, or a fixture to, the Leased Premises or Property. Lessee or its designees shall be the legal and beneficial owners of the Solar Facilities at all times and Owner shall have no right, title or interest in the Solar Facilities or any component thereof, notwithstanding that any such Solar Facilities may be physically mounted or adhered to the Leased Premises or Property. Owner covenants that it will use commercially reasonable efforts to place all parties having an interest in or lien upon the Property or the Leased Premises on notice of the ownership of the Solar Facilities and the legal status or classification of the Solar Facilities as personal property. Owner consents to the filing of a disclaimer of the Solar Facilities as a fixture of the Property in the office where real estate records are customarily filed in the jurisdiction(s) where the Property is situated. Except for the rent payments described in Section 5 above, Owner shall not be entitled to any other payments or benefits accrued by or from the Solar Facilities, including renewable energy credits, environmental credits or tax credits. All (a) tax credits, tax incentives or tax related grants or benefits and (b) renewable energy credits or other environmental attributes, credits or incentives, relating to the Solar Facilities are, and shall remain, the property of Lessee.

8.  **Taxes**.

**8.1** Taxes Payable. From and after the Operation Term Commencement Date, subject to terms and conditions of this Section 7.1, Lessee shall be responsible for and shall pay prior to delinquency, any and all real and personal property taxes, general and special assessments, and other similar charges levied on or assessed against the Leased Premises, including the improvements located on the Leased Premise, any other Lessee personal property located on or in the Leased Premises or any facilities or improvements located on the Leased Premises, to the full extent of installments relating to any period in the Agreement Term in addition to any taxes or changes in assessments that result from the loss of any classification of the Property as agricultural land, grazing land, open space or wildlife habitat, including, without limitation, all roll-back tax liability resulting from same (the "**Lessee Taxes**"). At the commencement of construction, Owner agrees to instruct the DeKalb County Tax Assessor to generate a copy of all notices, tax bills and other correspondence Owner would receive from any taxing authorities regarding any taxes associated with the Property to Lessee at the address set forth on the Cover Page. If Owner fails to perform this update in at the commencement of Construction, Lessee shall not be responsible for any interest or late fees with respect to any delinquent payments incurred prior to the notification to the County Assessor by Owner. Notwithstanding any other provision of this Section 7.1, if the law expressly permits the payment of any property taxes in installments (whether or not interest accrues on the unpaid balance), Lessee may, at its election, utilize the permitted installment method, but shall pay each installment with any interest before delinquency. Lessee shall have the right to contest the correctness or validity of any taxes, assessments and charges for which it is responsible hereunder, so long as such contest does not result in loss of or to the Property. Notwithstanding any other provision of this Section 7.1, Lessee shall not be obligated to pay for (a) any income taxes attributable to Owner; (b) any mortgage or transfer tax imposed against Owner; (c) any increase in the assessed value of the Property for tax purposes caused by Owner other than as a result of entering into and/or performing this Agreement or the Agreement Documents; or (d) taxes or assessments arising from or related to operations on any adjacent land owned by Owner. If Owner receives notice of any new Lessee Taxes, Owner shall provide timely notice of the assessment to Lessee sufficient to allow Lessee to consent to or challenge such Lessee Taxes, whether in a court, administrative proceeding, or other venue, on behalf of Owner and/or Lessee. Further, Owner shall provide Lessee any and all documentation associated with the Lessee Taxes and shall execute any and all documents reasonably necessary to effectuate the intent of this Section 7.1.

8.2 Tax Cooperation. Owner agrees to provide reasonable assistance (including providing timely signatures, if applicable) in connection with Lessee's efforts to submit any applications requesting the local taxing authority to perform a tax parcel division to create a separate tax number of the Leased Premises if such division is available. Further, Owner shall assist and cooperate with Lessee, at Lessee's sole cost and expense, to minimize any taxes related to the Solar Facilities, including taking any steps necessary to reasonably assist in the securing of property tax incentives.

9. **Lessee's Representations, Warranties, and Covenants**. Lessee hereby represents, warrants, and covenants to Owner that:

9.1 Lessee's Authority. Lessee has the unrestricted right and authority to execute this Agreement. Each person signing this Agreement on behalf of Lessee is authorized to do so. When signed by Lessee, this Agreement constitutes a valid and binding agreement enforceable against Lessee in accordance with its terms.

9.2 Insurance. Lessee shall, at its expense, maintain a broad form comprehensive coverage policy of public liability insurance insuring against loss or liability caused by Lessee's occupation

and use of the Property under the Agreement, in an amount not less than One Million Dollars ($1,000,000) of combined single limit liability coverage per occurrence, accident or incident, which has a commercially reasonable deductible. Certificates of such insurance shall be provided to Owner upon request of Owner.

9.3    No Liens. Lessee shall keep the fee title interest of the Property free and clear of all liens and claims of liens for labor and services performed on, and materials, supplies, or equipment furnished to, the Property in connection with Lessee's use of the Property pursuant to the Agreement; provided, however, that if Lessee wishes to contest any such lien, Lessee shall, within sixty (60) days after it receives notice of the filing of such lien, remove or bond over such lien from the fee title interest of the Property pursuant to applicable law and Lessee shall not be deemed to have breached this Section 8.4.

10. **Owner's Representations, Warranties, and Covenants**. Owner hereby represents, warrants, and covenants as follows:

10.1    Owner's Authority. Each person signing this Agreement on behalf of Owner is authorized to do so. When signed by Owner, this Agreement constitutes a valid and binding agreement enforceable against Owner in accordance with its terms.

10.2    Owner's Title to Property. Owner represents, warrants and covenants that Owner has (i) a lawful fee simple interest in title to the Property, including the Leased Premises, subject to any mortgages, leases, easements, covenants, restrictions, and rights of record that may exist, and (ii) that subject to the rights of existing tenants at the Property.

10.3    Conflict with Other Agreements. Owner represents and warrants that the execution, delivery and performance by it of this Agreement does not (i) violate its organizational documents or any Applicable Law, or (ii) require any approval or consent of any other Person, except for such approvals or consents that have been obtained on or before the date hereof or the absence of which could not, individually or in the aggregate, reasonably be expected to have a material adverse effect on its ability to execute, deliver or perform this Agreement.

10.4    No Brokers. Neither Owner nor any affiliate of Owner nor any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any brokers' fees, commissions or finders' fees as a result of the execution of this Agreement.

10.5    Litigation. No litigation is pending, and, to the best of Owner's knowledge, no actions, claims or other legal or administrative proceedings are pending, threatened or anticipated with respect to, or which could affect, the Premises or Owner's right or authority to enter into this Agreement.

10.6    Violations of Law. Owner has not received notice from any governmental agency pertaining to the violation of any law or regulation affecting the Property or any portion thereof, and Owner has no knowledge of any facts which might be a basis for any such notice.

10.7    Quiet Use. Owner covenants and agrees that Lessee shall have the quiet use and enjoyment of the Property in accordance with the terms of this Agreement without hindrance or interruption from Owner or any other person or persons, subject to all items of record as of the date hereof or arising from prescriptive or adverse use of the Property.

10.8    No Interference. Owner will not conduct activities on, in or about the Property or Leased Premises that have a reasonable likelihood of causing material damage, impairment or otherwise

materially adversely affecting the evaluation, investigation, construction, installation, maintenance, or operation of the Solar Facilities and/or Lessee's rights granted hereunder. After the Effective Date, other than with respect to a lien (mortgage or otherwise) complying with Section 9.9, Owner shall not without the prior written consent of Lessee voluntarily create or acquiesce in the creation of any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters or other exception to title to the Property, and Owner shall not create or suffer any monetary lien or encumbrance against the Property. To Owner's knowledge, there are no currently existing options, rights of refusal, sales contracts, or other such rights in favor of any third parties relating to the Property or any interest therein that could interfere with the development, construction, installation, maintenance, or operation by Lessee of the Solar Facilities or that could adversely affect Lessee's use of the Property

10.9    Non-Disturbance Agreements. In the event that owner elects to obtain a lien (mortgage or otherwise) on the Property, Owner will also obtain and deliver to Lessee a customary non-disturbance agreement of the Solar Facility executed by the lien holder.

10.10    Liens and Tenants. Except with respect to those items set forth in Exhibit C Owner represents that there are no unrecorded liens, encumbrances, leases, mortgages, deeds of trust, security interests, claims, disputes or other exceptions to Owner's right, title or interest in the Property. Prior to the commencement of the Operation Term with respect to any Property, Owner shall terminate any leases pertaining to the Leased Premises other than this Agreement. During the Term, Owner shall exercise best efforts to assist Lessee to obtain any non-disturbance, subordination, release, reconveyance and/or other title curative agreements from any person or entity with a lien, encumbrance, mortgage or other exception to Owner's fee title to the Property as requested by Lessee in order to facilitate development and financing of the Solar Facilities. If Owner and Lessee are unable to obtain such agreements from any person or entity holding an interest in the Property and Owner defaults on its obligations to such holder, then Lessee shall be entitled (but not obligated) to fulfill Owner's obligations to such holder and may offset the cost of doing so against future payments due Owner under this Agreement.

10.11    Cooperation. Owner shall assist and reasonably cooperate with Lessee, at no out-of-pocket expense to Owner, in complying with or obtaining any land use permits and approvals, building permits, consent orders, authorizations, environmental impact reviews or any other items required by Lessee for the Solar Facilities, including execution and filing of applications related thereto, and including participating in any appeals or regulatory proceedings respecting the Solar Facilities. Lessee shall reimburse Owner for its reasonable, actual and verifiable out-of-pocket expenses directly incurred in connection with such cooperation, to the extent Lessee has approved such expenses in advance in writing. Owner shall also cooperate with Lessee's development of the Property and shall cooperate with Lessee with respect to the negotiation of the relocation of any pipelines, electrical power distribution lines, collection pipes and any other structures located on the Property, as well as any rights associated with such pipelines, electrical power distribution lines or structures, as deemed necessary by Lessee in Lessee's reasonable discretion.

10.12    Conveyances and Other Agreements. In connection with the exercise of the rights of Lessee hereunder, Lessee, shall also have the right, without further act or consent of Owner with respect to grants that do not extend beyond the expiration of the Term, and with Owner's prior written consent, which shall not be unreasonably withheld, conditioned, or delayed, with respect to grants that will extend beyond the expiration of the Term: (a) to grant directly or (b) cause Owner to promptly grant to any party such rights or interests in or to the Property that are reasonably necessary or convenient for the Lessee's use of the Property for the Purpose (and for no other purpose whatsoever), including, without limitation,

means easements and similar associated rights to construct, operate, and maintain transmission, substation, collection, distribution, interconnection or switching lines or facilities pursuant to a standard form of easement or other similar agreement, lot line adjustments, right-of-way dedications, or rights of abandonment (the "**Additional Rights**"). The Parties agree that it would be unreasonable for Owner to withhold, condition, or delay its consent to any of the Additional Rights to the extent that the grant of the right or interest is necessary for the operation of the Solar Facilities.

10.13   Title Policy. Owner holds the entire fee simple interest in the Property. At Lessee's sole cost, Lessee may obtain a title insurance commitment to assess what curative items will need to be addressed in order to obtain an ALTA extended coverage leasehold policy of title insurance and enter into the Operating Term of this Agreement. Owner agrees to cooperate as necessary to assist with the title curative requirements and will not hinder what Lessee deems necessary to complete the title curative process. This includes, but is not limited to the recordation of documents necessary to effect such curative requirements such as non-disturbance agreements or other title curative agreements for any person or entity with a lien, encumbrance, mortgage, easement or other problematic exception to title to the Property as requested by Lessee in order to facilitate the development and financing of a solar energy project or projects on the Property.

11.   **Indemnity**.   Each Party as indemnitor shall indemnify, defend, and hold harmless the other Party and its Affiliates and their employees and agents against and from any and all loss, liability, damage, claim, cost, charge, demand, or expense (including reasonable attorneys' fees) asserted by third parties for injury or death to Persons (including employees of either Party) and/or physical damage to property arising out of or in connection with the negligent or intentional acts or omissions or willful misconduct of the indemnitor or a material breach of any obligation, representation or warranty of the indemnitor under this Agreement, except to the extent caused by the negligent acts or omissions or willful misconduct of the indemnified party. Lessee shall not be responsible to Owner or any third party, for any claims, costs or damages, including fines or penalties, attributable to any violations of Applicable Laws which existed prior to the Effective Date, or by any party other than the Lessee Parties. This Section 10 shall survive the termination or expiration of this Agreement.

12.   **Hazardous Substances**.   Neither Party shall introduce or use any Hazardous Substances on, in or under the Leased Premises or Property in violation of any Applicable Law. If a Party becomes aware of any Hazardous Substances on, in, or under the Leased Premises or Property, it shall promptly notify the other Party of the type and location of such Hazardous Substances in writing. Each Party agrees to indemnify, defend and hold harmless the other Party and its Affiliates and their employees and agents from and against any and all administrative and judicial actions and rulings, claims, causes of action, demands and liability, including, but not limited to, damages, costs, expenses, assessments, penalties, fines, losses, judgments, and reasonable attorneys' fees that any Party may suffer or incur due to the existence of any Hazardous Substances on the Property or the migration of any Hazardous Substance to other properties or the release of any Hazardous Substance into the environment ("**Environmental Claims**"), that relate to or arise from such Party's activities on the Property or Leased Premises, except to the extent directly attributable to the negligent acts or omissions or willful misconduct of the other Party. Owner shall further indemnify, defend and hold harmless Lessee and its Affiliates and their employees and agents from and against any and all Environmental Claims due to the presence of any Hazardous Substances in, on or under the Leased Premises as of the Effective Date.  The indemnifications in this Section 11 specifically include, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any Governmental Authority. Owner shall be responsible for, and shall promptly conduct any investigation and remediation

as required by any Applicable Law, all spills or other releases of any Hazardous Substances to the extent not caused by Lessee, that have occurred or which may occur on the Property.   This Section 11 shall survive the termination or expiration of this Agreement.

13. **Assignment**.  Subject to Section 9.8 and Section 19.8, each Party shall have the right and authority to sell, convey, assign, sublease or otherwise transfer, and/or collaterally assign, mortgage or encumber to one or more persons any or all of its right, title and interest under this Agreement (including Lessee's right to any Access and Utility Easements granted pursuant hereto) to one or more persons (each, an "**Assignee**").  The assigning Party shall notify the other Party in advance, in writing of any such assignment and the name and address of any Assignee. Notwithstanding the foregoing, Lessee shall have the right to assign its rights and obligations under this Agreement, without providing advance written notice (Lessee shall provide subsequent notice) and without the prior consent of Owner, to (i) any Lessee Affiliate, (ii) assignees whose net worth and financial strength are sufficient to meet all of Lessee's obligations under this Agreement and any Easement and who have experience operating or owning utility scale solar power generation projects, (iii) a Financing Party pursuant to Section 13, (iv) any Person or entity succeeding to all or substantially all of the stock or assets of Lessee, or (v) to a successor entity in a merger or acquisition transaction.

14. **Collateral Assignment**.   Notwithstanding anything herein to the contrary, Lessee may collaterally assign this Agreement and the Solar Facilities to a Financing Party without the need for consent from Owner.  Upon receipt of notice of the name and address of a Financing Party, Owner agrees to deliver any written notices of default to the Financing Party simultaneously with the delivery of such notices of default to Lessee. The Financing Party will have the right in its sole discretion, but not the obligation, (i) to enforce its lien and acquire title to all or any portion of the Solar Facilities by any lawful means, (ii) to take possession of and operate all or any portion of the Solar Facilities and to perform all obligations to be performed by Lessee under this Agreement, or to cause a receiver to be appointed to do so, (iii) to cure any defaults or breaches by Lessee within the time periods provided hereunder for Lessee plus an additional sixty (60) days in the case of an Event of Default under Section 14, and in order to succeed to the rights and obligations of Lessee under this Agreement shall not be required to cure any defaults by Lessee under Section 14 that by their nature are not capable of being cured by the Financing Party. Any such notices shall be sent to the Financing Party at the address specified in writing to Owner by Lessee or any Financing Party.   Failure by Owner to give the Financing Party such notice shall not diminish the Financing Party's rights against Lessee but shall preserve all rights of the Financing Party to cure any default and to remove any property of Lessee located on the Premises.

If Owner has been notified of the existence of a Financing Party, Owner will not agree to any amendment, modification or voluntary termination of this Agreement without the prior written consent of the Financing Party.  Owner agrees that, upon foreclosure (or assignment in lieu of foreclosure) of its mortgage or security interest in the Solar Facilities, the Financing Party may succeed to the rights and obligations of Lessee under this Agreement and thereafter, without Owner's consent, to assign or transfer all or any portion of the Solar Facilities to a third party. The Financing Party will be responsible for performance of Lessee's obligations after it succeeds to Lessee's interests under this Agreement but shall have no further liability hereunder after it assigns such interests to a third party.

If this Agreement is rejected or disaffirmed by Lessee pursuant to bankruptcy law or other law affecting creditor's rights and within ninety (90) days after such event any Financing Party shall have arranged to the reasonable satisfaction of Owner for performance of Lessee's obligations under this Agreement, then Owner shall execute and deliver to such Financing Party or to a designee of such Financing Party a new

agreement which (i) shall be for a term equal to the remainder of the Lease Term before giving effect to such rejection or termination; and (ii) shall contain the same covenants, agreements, terms, provisions and limitations as this Agreement.

An assignment by either Party in accordance with this Section 13 shall, provided that assignee assumes the assignor's obligations under this Agreement, relieve the assignor of its obligations hereunder, except with respect to undisputed payments due by the assignor as of the effective date of the assignment, which obligations shall be performed by assignor or assignee as a condition precedent to such assignment.

The provisions of this Section 13 shall survive the termination, rejection or disaffirmation of this Agreement and shall continue in full force and effect thereafter to the same extent as if this Section 13 were a separate and independent contract made by Owner, Lessee and each Financing Party.  Lessee's Financing Parties shall be express third party beneficiaries of this Section 13.

15. **Default/Remedies**.

15.1    Default.  Subject to the rights of Financing Parties as provided in Section 13, each of the following events shall constitute an "**Event of Default**" by a party and shall permit the non-defaulting party to terminate this Agreement and/or pursue all other appropriate remedies:

(a) Failure to Pay.  The failure or omission by either party to pay amounts required to be paid thereby when due hereunder, and such failure or omission has continued for thirty business (30) days after receipt of written notice from the other party;

(b) Failure to Perform.  The failure or omission by either party to observe, keep or perform any of the other terms, agreements or conditions set forth in this Agreement, and such failure or omission has continued for sixty 60) days (or such longer period as may reasonably be required to cure such failure or omission, provided that cure has commenced and such party is diligently proceeding to complete such cure) after written notice from the other party; or

(c) Bankruptcy.  A party files for protection or liquidation under the bankruptcy laws of the United States or any other jurisdiction or has an involuntary petition in bankruptcy or a request for the appointment of a receiver filed against it, and such involuntary petition or request is not dismissed within one hundred twenty (120) days after filing.

15.2    Remedies.  Upon the occurrence of an Event of Default by Lessee, subject to the rights of any Leasehold Mortgagees as set forth in Section 13, Owner may, at its option, and in addition to and cumulatively of any other rights Owner may have at law or in equity or under this Agreement, (a) cure the Lessee Event of Default on Lessee's behalf, in which event Lessee shall reimburse Owner on demand for all sums so expended by Owner, (b) terminate this Agreement by notice to Lessee and in conformity with procedures required hereby and by applicable law, or (c) enforce, by all proper and legal suits and other means, its rights hereunder, including the collection of sums due hereunder, in which event Owner shall have all remedies available at law or in equity.

16.  Removal.  Lessee shall exercise commercially reasonable efforts to remove any above grade Solar Facilities from the Property by the termination of this Agreement.  All Property disturbed by Lessee

shall be restored to a condition reasonably similar to its condition as of the Effective Date (Lessee shall have no obligation to restore buildings or other improvements Lessee is authorized to demolish or remove pursuant to this Agreement related to its use of the Property for the Solar Facilities). If Lessee fails to remove such Solar Facilities and to so restore the Property to a condition reasonably similar to its condition as of the Effective Date, Lessee shall thereafter continue to pay Rent hereunder until such removal and restoration work is completed on a monthly basis in an amount equal to the then annual Rent divided by 12 and multiplied by the percentage of the Property on which such removal and restoration work has not been completed as of the first day of each such month. If Lessee fails to complete the removal and restoration within twelve (12) months of the termination of the Agreement, or such longer period as Owner may provide by extension, Owner may do so, in which case Lessee shall reimburse Owner or Owner may draw upon the payment bond or letter of credit provided for in Section 16 below for the reasonable, direct and documented costs of removal and restoration incurred by Owner.

17. **Reclamation Estimate and Bond**. At the commencement of the Operation Term, Lessee shall shall retain an independent demolition contractor with solar experience that is reasonably acceptable to Owner to provide a good faith estimate of the total cost to remove all Solar Facilities and improvements made by or on behalf of Lessee and to restore any changes or damages made to the Property by Lessee to the condition required by applicable law (the "Reclamation Estimate"). Within ten (10) days after its receipt of the Reclamation Estimate, Lessee shall deliver a copy of the Reclamation Estimate to Owner. In the event the estimated removal cost exceeds the value of the solar equipment (the "Reclamation Differential"), Lessee shall deliver to Owner a payment bond or an irrevocable, stand-by letter of credit issued by a credit worthy bonding company of financial institution, as applicable, for an amount equal to the Reclamation Differential (the "Reclamation Security"). Lessee shall also provide to Owner the names of companies that could perform the reclamation work. If Lesse is required to deliver the Reclamation Security in the amount of the Reclamation Differential, no later than ten (10) years after the commencement of the Operation Term, Lessee shall deliver to Owner the Reclamation Security for the amount of the Reclamation Differential; provided that if pursuant to applicable law, Lessee has provided to any governmental agency other financial assurance for restoration of the Property (the proceeds of which are required to be applied to the restoration of the Property in the event Lessee otherwise fails to do so), Lessee shall be obligated to provide to Owner a payment bond or letter of credit only for the excess of the amount of the Reclamation Differential over the amount of the financial assurance provided to such governmental agency. Any Reclamation Security shall be released and returned to Lessee upon Owner's reasonable satisfaction that removal and restoration obligations under this Agreement have been fulfilled.

18. **Force Majeure**. If performance of the Agreement or of any obligation hereunder and/or Lessee's ability operate the Solar Facilities and to transmit and sell power therefrom to a third party purchaser is prevented, interfered or hindered by reason of an event of Force Majeure, the affected Party, upon giving notice to the other Party, shall be excused from such performance, and/or with respect to an event preventing, interfering or hindering Lessee's ability to operate the Solar Facilities and/or to transmit and sell power, the Rent payment obligation shall be abated, to the extent of and for the duration of such prevention, restriction or interference.   The affected Party shall use its reasonable efforts to avoid,

remove or repair such causes of nonperformance and shall continue performance hereunder whenever such causes are removed.

19. **Condemnation**. In the event the Leased Premises or Property are transferred to a condemning authority pursuant to a taking of all or a portion of the Property sufficient in Lessee's determination to render the Premises unsuitable for Lessee's use or to negatively impact the access to the Premises, Lessee shall have the right to terminate this Agreement immediately upon notice to Owner. If, following a condemnation, there exists a remaining portion of the Property that is suitable for the System and the leasing of such area to Lessee shall not materially impact Owner's operations on the Property in Owner's reasonable discretion, Lessee shall have an option to lease such portion of the Property on the same terms and conditions as this Agreement for the balance of the Operation Term or Extended Term, as applicable. Lessee shall exercise such option within ninety (90) days of a transfer of the Premises to the condemning authority. Sale to a purchaser with the power of eminent domain in the face of the exercise of the power shall be treated as a taking by condemnation under this Agreement. In the event of an award related to eminent domain or condemnation of all or part of the Premises, each Party shall be entitled to take from such award that portion as allowed by law for its respective property interest appropriated as well as any damages suffered thereby.

20. **Miscellaneous**.

20.1    Confidentiality. Owner will maintain in strict confidence, for the sole benefit of Lessee, the existence and the terms of this Agreement and the transactions contemplated herein, including but not limited to any business plans, financial information, technical information regarding the design, operation, maintenance of the System; *provided, however*, Owner may disclose this Agreement and the transactions contemplated herein to Owner's affiliates, subsidiaries, attorneys, consultants or other agents or professional advisors, or as required by law.

20.2    Successors and Assigns/Runs with the Land. The Agreement shall inure to the benefit of and be binding upon Owner and Lessee and their respective heirs, transferees, successors and assigns with respect to the Property and the Agreement, and all persons claiming under them. Owner agrees that this Agreement and all easements granted hereunder shall run with the Property and/or the Leased Premises and survive any transfer of all or any portion of the Property and/or the Leased Premises.

20.3    Notices. All notices under this Agreement shall be made in writing to the Addresses as follows:

| Lessee: | Owner: |
|---|---|
| Thalassa Energy Project, LLC<br>3809 Juniper Trace, Suite 100<br>Austin, TX 78738<br>Email: real.estate@7x.energy | ISS Land Management LLC<br>6688 CR 44<br>Butler, IN 46721<br>Email: andyhill@isssupport.com |

Notices shall be delivered by hand delivery, regular overnight delivery service (by a recognized courier), registered or certified mail return receipt requested, or email. Email notices shall require confirmation of

receipt. Notices shall be deemed to have been received when delivered as shown on the records or manifest of such courier, delivery service or the U.S. Postal Service. Rejection or refusal to accept delivery of any notice shall be deemed to be the equivalent of receipt of any notice given hereunder. A Party may change its address by providing written notice of the same in accordance with the provisions of this Section 19.3. Failure to comply strictly with the terms of this provision shall not be held against the Party claiming to have given notice so long as such Party substantially complied with this provision and can demonstrate that the notice in question was received.

     20.4   <u>Entire Agreement.</u>  This Agreement, including the Cover Page and all exhibits, represents the full and complete agreement between the Parties hereto with respect to the subject matter contained herein and therein and supersedes all prior written or oral negotiations, representations, communications and agreements between said parties with respect to said subject matter. This Agreement may be amended only in writing signed by both Lessee and Owner or their respective successors in interest. Owner and Lessee each acknowledge that in executing this Agreement that Party has not relied on any verbal or written understanding, promise, or representation which does not appear in this document.

     20.5   <u>Dispute Resolution.</u>  This Agreement shall be governed by and interpreted in accordance with the laws of the State where the Property is located. Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled solely and exclusively by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. The number of arbitrators shall be three. The place of arbitration shall be at the American Arbitration Association Regional Office nearest the Property, or in another convenient location as agreed by the Parties. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The Parties agree that any rule of construction to the effect that ambiguities are to be resolved in favor of either Party shall not be employed in the interpretation of this Agreement and is hereby waived. The prevailing Party in any action or proceeding for the enforcement, protection or establishment of any right or remedy under this Agreement shall be entitled to recover its reasonable attorneys' fees and costs in connection with such action or proceeding from the non-prevailing Party.

     20.6   <u>Partial Invalidity or Unintended Consequence, Requirement to Cure.</u> If any provision of this Agreement is declared or determined by any court of competent jurisdiction to be illegal, invalid or unenforceable, the legality, validity or enforceability of the remaining parts, terms and provisions shall not be affected thereby, and said illegal, unenforceable or invalid part, term or provision will be deemed not to be a part of this Agreement; *provided, however*, that the Parties shall work together in good faith to modify this Agreement as necessary to retain the intent of any such severed clause. Notwithstanding any other provision of this Agreement, the parties agree that in no event shall the term of this Agreement or any Access/Gen-Tie Easement be longer than the longest period permitted by applicable law. The Development Term of this Agreement shall be construed as an "option" and not a "lease" under the laws of the state where the Property is situated.

     20.7   <u>Tax and Renewable Energy Credits.</u>  If under applicable law, the holder of the Agreement becomes ineligible for any tax credit, renewable energy credit, environmental credit or any other benefit or incentive for renewable energy established by any local, state or federal government, then, at Lessee's option, Owner and Lessee shall exercise good faith and negotiate an amendment to this Agreement or replace it with a different instrument so as to convert Lessee's interest in the Property to a substantially similar interest that makes Lessee eligible for such credit, benefit or incentive. These negotiations shall in no way affect the acreage leased or rent payments as defined in Exhibit D.

*17*

20.8     Notice of Owner's Intent to Sell the Property.  Should Owner decide to sell the Property to a third party (excluding family members), Owner shall allow Lessee to make an offer to purchase the Property by notifying Lessee in writing and allowing Lessee thirty (30) days to may make a written offer to purchase the Property.  Owner is obligated to provide such notice to Lessee prior to offering the Property to a third party (excluding family members). If Owner accepts Lessee's offer, all costs and expenses of the sale including attorney's fees, recording fees, and any and other costs attributable to the preparation of the warranty deed, title certificate, abstract and any other closing documents shall be paid by Lessee.  If Lessee declines to make an offer to purchase the Property, Lessee will deliver to Owner their response to owner within this thirty (30) day period. If Owner declines Lessee's offer to purchase the Property, Owner will be free to sell the property to a third property upon terms and conditions that are materially no less favorable than are set forth in Purchaser's offer, with such Purchaser taking subject to this Agreement.

20.9     Waiver of Consequential Damages.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT, WHETHER BASED ON CONTRACT, INDEMNITY, WARRANTY, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, SHALL EITHER PARTY, OR ITS AFFILIATES OR ITS AND THEIR RESPECTIVE DIRECTORS, MANAGERS, OFFICERS, SHAREHOLDERS, PARTNERS, MEMBERS, EMPLOYEES, CONTRACTORS, AGENTS AND REPRESENTATIVES, BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES THAT ARISE OUT OF, RELATE TO, OR ARE OTHERWISE ATTRIBUTABLE TO THIS AGREEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF DUTIES HEREUNDER.

20.10     Further Assurances.  Each Party shall, whenever reasonably requested by the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all conveyances, assignments and all other instruments and documents as may be reasonably necessary in order to complete the transactions herein provided and to carry out the terms and provisions of this Agreement. Owner shall also execute any estoppel certificates, consents to assignments or additional documents that may be reasonably necessary for recording purposes or otherwise reasonably requested by Lessee.

20.11     Time is of the Essence.  Time is of the essence with respect to the performance of every provision of this Agreement (subject to any applicable cure periods set forth herein).

20.12     No Partnership.  This Agreement is not intended and shall not be construed to create any partnership or joint venture or any other relationship other than one of 'owner/lessor' and 'lessee' and 'grantor' and 'grantee', and neither Party shall be deemed the agent of the other Party nor have the authority to act as agent for the other Party.

20.13     Survival.  In addition to those provisions specifically identified as surviving the termination of this Agreement, provisions of this Agreement that should reasonably be considered to survive termination of this Lease shall also survive.

20.14     Counterparts.  This Agreement may be executed in any number of counterparts, which shall together constitute one and the same agreement.  Each Party agrees that signatures transmitted by facsimile or electronically shall be legal and binding and have the same full force and effect as if an original of this Agreement and had been delivered and hereby waive any defenses to the enforcement of the terms of this Agreement based on the foregoing forms of signature.

**SIGNATURES TO FOLLOW ON NEXT PAGES**

IN WITNESS WHEREOF, Owner and Lessee, individually or through duly authorized representatives, hereby, execute this Agreement and certify that they have read, understand and agree to the terms and conditions of this Agreement.

OWNER
**ISS Land Management LLC**

By: _____ Owner

Timothy A. Hill, Owner

Date: __4-22-2001__

Phone: __260-645-0289__

Email: __Andy.Hill@isssupport.com__

**LESSEE**
**THALASSA Energy Project LLC**
a Texas limited liability company


By: _____
    Clay Butler
    President


Date: _____

**Phone:  512/992-0439**
**Email:  real.estate@7x.energy**

*21*

## EXHIBIT A

### DEFINITIONS:

"**Access and Utility Easements**" has the meaning set forth in <u>Section 3.3(a)</u>.

"**Access Property**" has the meaning set forth in <u>Section 3.3(a)</u>.

"**Additional Rights**" has the meaning set forth in Section 9.12.

"**Assignee**" has the meaning set forth in Section 12.

"**Cover Page**" means the second page of this Agreement.

"**Development Term**" has the meaning set forth in <u>Section 2.1</u>.

"**Development Term Expiration Date**" has the meaning set forth in <u>Section 2.1</u>.

"**Development Term Rent**" has the meaning set forth in <u>Section 5.1</u>.

"**Effective Date**" has the meaning set forth in the first paragraph of this Agreement.

"**Environmental Claims**" has the meaning set forth in <u>Section 11</u>.

"**Environmental Law**" means and includes, without limitation, any present or future federal, state or local law, whether under common law, statute, rule, regulation or otherwise, requirements under permits or other authorizations issued with respect thereto, and other orders, decrees, judgments, directive or other requirements of any Governmental Authority relating to or imposing liability or standards of conduct, disclosure or notification with regard to the protection of human health, the environment, ecological conditions, Hazardous Substances or any activity involving Hazardous Substances.

"**Event of Default**" has the meaning set forth in <u>Section 14.1</u>.

"**Extended Term**" has the meaning set forth in <u>Section 3.2</u>.

"**Financing Party**" means, as applicable (i) any Person (or its agent) from whom Lessee (or a Lessee Affiliate) leases the Solar Facilities or (ii) any Person (or its agent) who has made or will make a loan to or otherwise provide capital to Lessee (or a Lessee Affiliate) with respect to the Solar Facilities. Lessee shall provide written notice to Owner of, and the contact information for, any Financing Party.

"**Force Majeure**" means  fire, earthquake, flood, explosions, lightning or other casualty or accident; epidemics; strikes or labor disputes; war, civil strife or other violence; power failures or power surges, vandalism, theft, terrorism, the unauthorized cutting of power, transmission or other lines, wires or cables to solar equipment, any law, order, proclamation, regulation, ordinance, action, demand or requirement or changes in law or applicable regulations subsequent to the date hereof of any government agency or utility; or any other act or condition beyond the reasonable control and without the fault or negligence of the Party claiming Force Majeure.

"**Governmental Authority**" means any federal, state, regional, county, town, city or municipal government, whether domestic or foreign, or any department, agency, bureau or other administrative, regulatory or judicial body of any such government.

"**Hazardous Substances**" means and includes, without limitation any substance, chemical, material or waste: (i) the presence of which causes a nuisance or trespass of any kind under any applicable Environmental Law; (ii) which is regulated by any Governmental Authority; (iii) is likely to create liability under any Environmental Law because of its toxic, flammable, corrosive, reactive, carcinogenic, mutagenic, infectious, radioactive, or other hazardous property or because of its effect on the environment, natural resources or human health and safety, including but not limited to, flammables and explosives, gasoline, petroleum and petroleum products, asbestos containing materials, polychlorinated biphenyls, lead and lead-based paint, radon, radioactive materials, microbial matter, biological toxins, mycotoxins, mold or mold spores or any hazardous or toxic material, substance or waste which is defined by those or similar terms or is regulated as such by any Governmental Authority; or (iv) which is designated, classified, or regulated as being a hazardous or toxic substance, material, pollutant, waste (or a similar such designation) under any federal, state or local law, regulation or ordinance, including under any Environmental Law.

"**Leased Premises**" has the meaning set forth in Section 2.1.

"**Lessee**" has the meaning set forth in the first paragraph of this Agreement.

"**Lessee Parties**" means Lessee and its Affiliates and their employees and agents.

"**Lessee Taxes**" has the meaning set forth in Section 7.1.

"**Lessee Affiliate**" means an entity controlling, controlled by, or under common control with Lessee, and a Leasehold Mortgagee shall include any agent, security agent, collateral agent, indenture trustee, loan trustee, loan participant or participating or syndicated lenders involved in whole or in part in such financing, and their respective representatives, successors and assigns.

"**Memorandum**" has the meaning set forth in Section 1.

"**Net Acreage**" means the total gross acreage of the Leased Premises less the total acreage subject to third party surface rights (such as third party easement or right of way rights) or any condemnation action or proceeding such that it is not suitable for the installation of solar facilities.

"**Operation Term Commencement Date**" has the meaning set forth in Section 2.1.

"**Operation Term Commencement Notice**" has the meaning set forth in Section 2.1.

"**Operation Term**" has the meaning set forth in Section 3.1.

"**Operation Term Expiration Date**" has the meaning set forth in Section 3.1.

"**Operation Term Rent**" has the meaning set forth in Section 5.2 (and as set forth on Exhibit D.

"**Owner**" has the meaning set forth in the first paragraph of this Agreement.

"**Party**" or "**Parties**" has the meaning set forth in the first paragraph of this Agreement.

*23*

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Property**" has the meaning set forth in the Recitals.

"**Purpose**" has the meaning set forth in the Recitals.

"**Reclamation Estimate**" means a good faith estimate of the total cost to remove all Solar Facilities and improvements made by or on behalf of Lessee and to restore any changes made to the Property by Lessee to the condition required by applicable law and by Section 16.

"**Remainder Property**" has the meaning set forth in Section 3.3(b).

"**Rent**" has the meaning set forth in Section 5.

"**Solar Easements**" has the meaning set forth in Section 3.3(b).

"**Solar Easement Instruments**" has the meaning set forth in Section 3.3(b).

"**Solar Facilities**" means solar energy collection and electrical generating and storage equipment of all types including, without limitation, any such equipment utilizing photovoltaic, energy storage, and/or solar thermal technology, overhead and underground electrical and communications lines, electric transformers, telecommunications equipment, roads, meteorological towers and solar energy measurement and storage equipment, control buildings, operations and maintenance buildings, maintenance yards, substations, switchyards, and related facilities and equipment.

"**Subdivided Leaseholds**" has the meaning set forth in Section 14.

"**Survey**" has the meaning set forth in Section 2.4.

"**Term**" has the meaning set forth in Section 3.2.

"**Termination Notice**" has the meaning set forth in Section 2.1.

**EXHIBIT B – LEASED PROPERTY**

All that real property situated in DeKalb County, State of Indiana, described as follows:

**PARCEL 1:**

**PARCEL NOS.:  17-07-35-100-007**
                   **17-07-35-200-006**
                   3.64 acres, more or less

LOTS NUMBERED ONE (L) AND TWO (2) IN M AND J ESTATES, A SUBDIVISION TO DEKALB COUNTY, INDIANA, ACCORDING TO THE PLAT THEREOF, RECORDED AS DOCUMENT #20901122 IN THE OFFICE OF THE RECORDER OF DEKALB COUNTY, INDIANA. CONTAINING 3.64 ACRES, MORE OR LESS.

**PARCEL 2:**

**AP NO. 15-07-35-100-005**
36.679 acres, more or less

THE NORTH THREE FOURTHS OF THE EAST ONE-HALF OF THE NORTHWEST QUARTER OF SECTION THIRTY-FIVE (35) TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST IN DEKALB COUNTY, INDIANA;

SAVE AND EXPECT APROXIMATELY 12.5 ACRES, BEING THE FORESTED PORTION OF THE PARCEL;

AND EXCEPTING THE FOLLOWING DESCRIBED TRACT OF LAND:

BEGINNING AT A POINT ON THE NORTH LINE OF SAID SECTION 35 AND 137.5 FEET WEST OF THE NORTH QUARTER (1/4) CORNER OF SAID SECTION 35, THENCE SOUTH PERPENDICULAR TO SAID NORTH LINE OF SAID SECTION 357.05 FEET; THENCE WEST PARALLEL WITH THE SAID NORTH LINE OF SAID SECTION 244 FEET; THENCE NORTH 357.05 FEET PERPENDICULAR TO THE LAST DESCRIBED LINE TO SAID NORTH LINE OF SAID SECTION; THENCE EAST 244 FEET ON SAID NORTH LINE OF SAID SECTION TO THE POINT OF BEGINNING AND ENCLOSING AN AREA OF 2.00 ACRES MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A PARCEL OF LAND SITUATED IN A PART OF THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN WILMINGTON TOWNSHIP, DEKALB COUNTY, INDIANA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 35; THENCE WEST BEARING ASSUMED ALONG THE NORTH LINE THEREOF 381.5 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 357.05 FEET TO AN IRON STAKE; THENCE WEST PARALLEL WITH SAID NORTH LINE OF SECTION 35 DISTANCE OF 280.0 FEET TO AN IRON STAKE; THENCE NORTH 357.05 FEET TO A RAILROAD SPIKE ON SAID NORTH LINE OF THE NORTHWEST QUARTER OF SECTION 35; THENCE EAST ALONG SAID NORTH LINE 280.0 FEET TO THE POINT OF BEGINNING. CONTAINING 2.295 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A PART OF THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNIY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 90 DEGREES OO MINUTES OO SECONDS WEST (ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 137.50 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER TO THE NORTHEAST CORNER OF A TRACT OF REAL ESTATE CONVEYED BY GEORGE TITTLE AND ANN TITLE TO DAVID J. MILLER AND BETTY L. MILLER IN WARRANTY DEED DATED MAY 23, 1978 AND RECORDED IN DEKALB COUNTY, INDIANA RECORDER'S OFFICE IN DEED RECORD 167 AT PAGE 318, SAID CORNER MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH OO DEGREES OO MINUTES OO SECONDS WEST, 357.05 FEET ON AND ALONG THE EAST LINE OF SAID MILLER TRACT TO THE SOUTHEAST CORNER OF SAID MILLER TRACT MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 90 DEGREES OO MINUTES OO SECONDS EAST, 132.46 FEET ON AND ALONG THE EXTENDED SOUTH LINE OF SAID MILLER TRACT TO A 5/8 INCH DIAMETER REBAR ON THE EAST LINE OF SAID NORTHWEST QUARTER; THENCE NORTH 00 DEGREES 46 MINUTES 33 SECONDS EAST, 357.09 FEET ON AND ALONG THE EAST LINE OF SAID NORTHWEST QUARTER TO THE POINT OF BEGINNING CONTAINING 1.106 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A TRACT OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN DEKALB COUNTY, THE STATE OF INDIANA, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER MARKED BY A HARRISON MARKER FOUND THIS SURVEY; THENCE WEST (RECORD), ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 661.50 FEET TO THE PONT OF BEGINNING MARKED BY A REBAR SET THIS SURVEY AT THE NORTHWEST CORNER OF A TRACT OF LAND CONVEYED TO DAVID J. MILLER AND BETTY L. MILLER PER DEKALB COUNTY DEED RECORD BOOK 167, PAGE 319; THENCE CONTINUING WEST, ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 658.27 FEET TO THE NORTHWEST CORNER OF THE EAST HALF OF SAID NORTHWEST QUARTER MARKED BY A REBAR SET THIS SURVEY; THENCE SOUTH OO DEGREES 49 MINUTES 18 SECONDS WEST, ALONG THE WEST LINE OF THE EAST HALF OF SAID NORTHWEST QUARTER, FOR 357.09 FEET TO A REBAR SET THIS SURVEY, THENCE EAST, PARALLEL WITH THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 663.39 FEET TO A REBAR SET THIS SURVEY AT THE SOUTHWEST CORNER OF SAID TRACT CONVEYED TO MILLER; THENCE NORTH, ALONG THE WEST LINE OF SAID TRACT CONVEYED TO MILLER, FOR 357.05 FEET TO THE POINT OF BEGINNING, SAID TRACT CONTAINING 5.42 ACRES, MORE OR LESS.

CONTAINING AFTER SAID EXCEPTIONS, 49.179 ACRES, MORE OR LESS.

### PARCEL 3:

**AP NO. 15-07-35-200-005**
20.80 acres, more or less

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST IN DEKALB COUNTY, INDIANA EXCEPTING THEREFROM FORESTED 5.5 ACRES ON THE SOUTHERN BORDER OF THE PARCEL.

ALSO, EXCEPTING THEREFROM:

A PART OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNTY, INDIANA, ANO BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 388.00 FEET ON ANO ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 100 DEGREES 48 MINUTES 33 SECONDS WEST, 357.09 FEET PARALLEL WITH THE WEST LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 59 MINUTES 37 SECONDS WEST, 366.00 FEET PARALLEL WITH THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR ON THE WEST LINE OF SAID NORTHEAST QUARTER; THENCE NORTH 00 DEGREES 48 MINUTES 33 SECONDS EAST, 357.09 FEET ON ANO ALONG THE WEST LINE OF SAID NORTHEAST QUARTER TO THE POINT OF BEGINNING, CONTAINING 3.000 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM, THE FOLLOWING DESCRIBED REAL ESTATE, TO-WIT;

A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL. WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

ALSO, SAVE AND EXCEPT 1.5 ACRES, MORE OR LESS, OUT OF THE MOST NORTHEASTERLY PORTION OF THIS PARCEL WHICH HAS BEEN DEVELOPED THEREON.

CONTAINING AFTER SAID EXCEPTIONS, 26.308 ACRES, MORE OR LESS.

**PARCEL 4:**

**AP NO. 15-07-35-200-007**

1.00 acres, more or less

THE NORTHERN ONE (1) ACRE OF THE SOUTHERNMOST 6.02 ACRES OUT OF A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF  THE NORTHWEST QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

EXHIBIT B.1 – SALE PROPERTY

**PARCEL 1:**

**PARCEL NO.: 17-07-35-100-004**
**2.00 acres, more or less**

**PARCEL 2:**

**PARCEL NO.: 17-07-35-100-003**
**2.30 acres, more or less**

**PARCEL 3:**

**PARCEL NO.: 17-07-35-200-007**
**3.19 acres, more or less**
THE MOST NORTHERLY 3.19 ACRES, MORE OR LESS, OF THE FOLLOWING DESCRIBED PARCEL:
PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34)
NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND
BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35
MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST
(ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON
AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE
NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4)
MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION,
THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG
THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE
NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER
REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE
EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE
SOUTHEAST CORNER OF  THE NORTHWEST QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4)
MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST
300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST
QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS
EAST 1334.77 FEET PARALLEL WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID
NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS,

**PARCEL 4:**

**PARCEL NO.: 17-07-35-200-005**
**1.5 acres, more or less**
1.5 ACRES, MORE OR LESS, OUT OF THE MOST NORTHEASTERLY PORTION OF THE FOLLOWING
DESCRIBED PARCEL:

A PART OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND
PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNTY, INDIANA, ANO BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

*29*

BEGINNING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 388.00 FEET ON ANO ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 100 DEGREES 48 MINUTES 33 SECONDS WEST, 357.09 FEET PARALLEL WITH THE WEST LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 59 MINUTES 37 SECONDS WEST, 366.00 FEET PARALLEL WITH THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR ON THE WEST LINE OF SAID NORTHEAST QUARTER; THENCE NORTH 00 DEGREES 48 MINUTES 33 SECONDS EAST, 357.09 FEET ON ANO ALONG THE WEST LINE OF SAID NORTHEAST QUARTER TO THE POINT OF BEGINNING, CONTAINING 3.000 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM, THE FOLLOWING DESCRIBED REAL ESTATE, TO-WIT;

A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL. WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

**PARCEL 5:**

**PARCEL NO.: 17-07-35-100-008**
5.42 acres, more or less

A TRACT OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN DEKALB COUNTY, THE STATE OF INDIANA, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER MARKED BY A HARRISON MARKER FOUND THIS SURVEY; THENCE WEST (RECORD), ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 661.50 FEET TO THE PONT OF BEGINNING MARKED BY A REBAR SET THIS SURVEY AT THE NORTHWEST CORNER OF A TRACT OF LAND CONVEYED TO DAVID J. MILLER AND BETTY L. MILLER PER DEKALB COUNTY DEED RECORD BOOK 167, PAGE 319; THENCE CONTINUING WEST, ALONG THE NORTH

LINE OF SAID NORTHWEST QUARTER, FOR 658.27 FEET TO THE NORTHWEST CORNER OF THE EAST HALF
OF SAID NORTHWEST QUARTER MARKED BY A REBAR SET THIS SURVEY; THENCE SOUTH OO DEGREES 49
MINUTES 18 SECONDS WEST, ALONG THE WEST LINE OF THE EAST HALF OF SAID NORTHWEST
QUARTER, FOR 357.09 FEET TO A REBAR SET THIS SURVEY, THENCE EAST, PARALLEL WITH THE NORTH
LINE OF SAID NORTHWEST QUARTER, FOR 663.39 FEET TO A REBAR SET THIS SURVEY AT THE
SOUTHWEST CORNER OF SAID TRACT CONVEYED TO MILLER; THENCE NORTH, ALONG THE WEST LINE
OF SAID TRACT CONVEYED TO MILLER, FOR 357.05 FEET TO THE POINT OF BEGINNING, SAID TRACT
CONTAINING 5.42 ACRES, MORE OR LESS.

## EXHIBIT B.2

Map of Described For Sale, For Lease and Excluded Areas



**EXHIBIT C**

<u>OWNERS LIST OF KNOWN UNRECORDED LEASES/LIENS</u>

**EXHIBIT D**

Operating Rent

Lessee shall pay to Owner as rent in consideration of the rights granted hereunder with respect to such Property during the Operation Term applicable to such Property, the following annual operating Rent due and payable within 30 days of January 1 of each calendar year ("**Operating Rent**") according to the table set forth below, with the first and last payments to be prorated according to the Operation Term Commencement Date:

| Construction & Operation Term Years | Operating Rent Payment ($/Net Acre/Year) |
|---|---|
| Construction Period | $750.00 |
| 1-5 | $750.00 |
| 6-10 | $770.00 |
| 11-15 | $790.00 |
| 16-20 | $810.00 |
| 21-25 | $830.00 |
| 26-30 | $850.00 |
| 31-35 | $870.00 |
| 36-40 (if extension exercised) | $890.00 |
| 41-45 (if extension exercised) | $910.00 |
| 46-50 (if extension exercised) | $930.00 |

# EXHIBIT E

(Original to be detached and recorded at County Courthouse)

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

THALASSA Energy Project
c/o 7X USA, LLC
3809 Juniper Trace, #100
Austin, TX 78738

## MEMORANDUM OF LEASE AGREEMENT

THIS MEMORANDUM OF LEASE AGREEMENT (the "*Memorandum*"), is entered into by and between ISS Land Management LLC (the "**Owner**") whose address is 6688 CR 44, Butler, IN 46721 and THALASSA Energy Project, LLC, a Texas limited liability company ("**Lessee**") whose address is 3809 Juniper Trace, Suite, 100, Austin, Texas, 78738. Owner and Lessee shall sometimes be referred to herein individually as a "Party" and collectively as the "Parties".

1. Owner and Lessee entered into a Lease Agreement dated April _____, 2021 (the "Lease") that is effective as of the same date, which Owner by its terms leased and granted to Lessee certain rights and interests in the land located in DeKalb County, State of Indiana, described in Exhibit A attached hereto and incorporated by this reference (the "**Property**") for solar energy purposes, including, without limitation, solar resource evaluation, solar energy development, converting solar energy into electrical energy, collecting and transmitting the electrical energy converted from solar energy, energy storage purposes, and electric power, heat and/or steam generation, and any and all other activities related to the foregoing and to convert all of the solar resources of the Property, together with any and all activities related thereto, including, without limitation, constructing, installing, using, replacing, relocating and removing from time to time, and maintaining and operating Solar Facilities.

   "Solar Facilities" means energy collection and electrical generating and storage equipment of all types including, without limitation, any such equipment utilizing photovoltaic, energy storage, and/or solar thermal technology, overhead and underground electrical and communications lines, electric transformers, telecommunications equipment, roads, meteorological towers and solar energy measurement and storage equipment, control buildings, operations and maintenance buildings, maintenance yards, substations, switchyards, and related facilities and equipment.

2. Owner has granted to Lessee as of the effective date of the Lease the right of access on, over and across the Property for ingress and egress to and from its Solar Facilities and appurtenant equipment and electrical power lines whether located on the Property or elsewhere and such additional areas of the Property as shall be reasonably necessary to access a public roadway.

3. Owner shall not (and shall not allow any other party to) disturb or interfere with the unobstructed flow of solar energy upon, over and across the Property, whether by placing towers or antennas of any type, planting trees or constructing buildings or other structures or facilities, or by engaging in any other activity on the Property or any real property adjacent to the Property that is owned or controlled by Owner, if any (the "**Remainder Property**") that might delay the installation of,

1

disrupt, or otherwise cause a decrease in the output or efficiency of the Solar Facilities. In furtherance thereof, Owner hereby grants and conveys to Lessee and its successors and assigns the exclusive easement to the free and unobstructed insolation of solar energy on, about, above, under, through and across the Property, including over the entirety of the horizontal space and the entirety of the vertical space lying above the surface of the Property and that portion of any Remainder Property contiguously situated around the Property (if any) for the benefit of the Property; provided Owner shall have the continued right to use the Remainder Property for any uses existing as of the Effective Date and any new uses which are wholly consistent with the Lease.

4.    The initial term of the Lease is thirty-five (35) years from the date that the Solar Facilities commence to generate power, subject to the terms and provisions contained therein. Lessee has also been granted an option to extend the initial term for three (3) additional five (5) year periods, subject to the terms of the Lease.

5.    The Solar Facilities shall not be deemed a fixture. The Solar Facilities are Lessee's personal property and Owner has no right, title or interest in the Solar Facilities.

6.    Owner will not conduct activities on, in or about the Property that have a reasonable likelihood of causing material damage, impairment or otherwise materially adversely affecting the evaluation, investigation, construction, installation, maintenance, or operation of the Solar Facilities and/or Lessee's rights granted hereunder. After the Effective Date, other than with respect to a lien (mortgage or otherwise) complying with the Lease, Owner shall not without the prior written consent of Lessee voluntarily create or acquiesce in the creation of any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters or other exception to title to the Property, and Owner shall not create or suffer any monetary lien or encumbrance against the Property.

7.    The Property shall be subject to the provisions set forth in the Agreement and herein, which provisions shall run with the Property and shall be binding upon and inure to the benefit of the parties and each other person and entity having any interest therein during the term of the Agreement and their respective heirs, successors and assigns.

8.    All of the terms, conditions, provisions and covenants of the Lease are hereby incorporated into this Memorandum by reference as though fully set forth herein. This Memorandum does not supersede or modify the provisions of the Agreement. Should there be an inconsistency between the terms of this Memorandum and the Agreement, the terms of the Lease shall control. Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the Lease.

9.    This Memorandum and the Agreement are governed by Indiana law.


**SIGNATURE PAGES TO FOLLOW**


*2*

**IN WITNESS WHEREOF**, the parties have executed this Memorandum as of the day and year first written above.

**OWNER**
**ISS Land Management LLC**

By: _Timothy A Hill, Owner_
Timothy A. Hill, Owner

State of INDIANA        }
                        }
County of DeKALB        }

I, the undersigned Notary Public, hereby certify that Timothy A. Hill, as Owner of ISS Land Management LLC, whose name is signed to the foregoing conveyance, and who is known to me or proved to me on the basis of satisfactory evidence, acknowledged before me on this day that, being informed of the contents of the conveyance, he/she executed the same voluntarily on the day the same bears date.

Given under my hand this _____ day of April, 2021.

(Seal)

_____
Notary Public
My Commission Expires: _____

*3*

**LESSEE**
**THALASSA Energy Project, LLC**
a Texas limited liability company


By: _____
      Clay Butler
      President


STATE OF TEXAS              §
                            §
COUNTY OF TRAVIS            §

This instrument was acknowledged before me by Clay Butler, as President of Thalassa Energy Project LLC, a Texas limited liability company, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expresses.

Given under my hand and seal this _____ day of April, 2021.


_____

Notary Public

My Commission Expires: _____

*4*

## EXHIBIT A

All that real property situated in DeKalb County, State of Indiana, described as follows:

### PARCEL 1:

**PARCEL NOS.: 17-07-35-100-007**
**17-07-35-200-006**
3.64 acres, more or less

LOTS NUMBERED ONE (L) AND TWO (2) IN M AND J ESTATES, A SUBDIVISION TO DEKALB COUNTY, INDIANA, ACCORDING TO THE PLAT THEREOF, RECORDED AS DOCUMENT #20901122 IN THE OFFICE OF THE RECORDER OF DEKALB COUNTY, INDIANA. CONTAINING 3.64 ACRES, MORE OR LESS.

### PARCEL 2:

**AP NO. 15-07-35-100-005**
36.679 acres, more or less

THE NORTH THREE FOURTHS OF THE EAST ONE-HALF OF THE NORTHWEST QUARTER OF SECTION THIRTY-FIVE (35) TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST IN DEKALB COUNTY, INDIANA.

SAVE AND EXPECT APROXIMATELY 12.5 ACRES, BEING THE FORESTED PORTION OF THE PARCEL;

AND EXCEPTING THE FOLLOWING DESCRIBED TRACT OF LAND:

BEGINNING AT A POINT ON THE NORTH LINE OF SAID SECTION 35 AND 137.5 FEET WEST OF THE NORTH QUARTER (1/4) CORNER OF SAID SECTION 35, THENCE SOUTH PERPENDICULAR TO SAID NORTH LINE OF SAID SECTION 357.05 FEET; THENCE WEST PARALLEL WITH THE SAID NORTH LINE OF SAID SECTION 244 FEET; THENCE NORTH 357.05 FEET PERPENDICULAR TO THE LAST DESCRIBED LINE TO SAID NORTH LINE OF SAID SECTION; THENCE EAST 244 FEET ON SAID NORTH LINE OF SAID SECTION TO THE POINT OF BEGINNING AND ENCLOSING AN AREA OF 2.00 ACRES MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A PARCEL OF LAND SITUATED IN A PART OF THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN WILMINGTON TOWNSHIP, DEKALB COUNTY, INDIANA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 35; THENCE WEST BEARING ASSUMED ALONG THE NORTH LINE THEREOF 381.5 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 357.05 FEET TO AN IRON STAKE; THENCE WEST PARALLEL WITH SAID NORTH LINE OF SECTION 35 DISTANCE OF 280.0 FEET TO AN IRON STAKE; THENCE NORTH 357.05 FEET TO A RAILROAD SPIKE ON SAID NORTH LINE OF THE NORTHWEST QUARTER OF SECTION 35; THENCE EAST ALONG SAID NORTH LINE 280.0 FEET TO THE POINT OF BEGINNING. CONTAINING 2.295 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A PART OF THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNIY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 90 DEGREES OO MINUTES OO SECONDS WEST (ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 137.50 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER TO THE NORTHEAST CORNER OF A TRACT OF REAL ESTATE CONVEYED BY GEORGE TITTLE AND ANN TITLE TO DAVID J. MILLER AND BETTY L. MILLER IN WARRANTY DEED DATED MAY 23, 1978 AND RECORDED IN DEKALB COUNTY, INDIANA RECORDER'S OFFICE IN DEED RECORD 167 AT PAGE 318, SAID CORNER MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH OO DEGREES OO MINUTES OO SECONDS WEST, 357.05 FEET ON AND ALONG THE EAST LINE OF SAID MILLER TRACT TO THE SOUTHEAST CORNER OF SAID MILLER TRACT MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 90 DEGREES OO MINUTES OO SECONDS EAST, 132.46 FEET ON AND ALONG THE EXTENDED SOUTH LINE OF SAID MILLER TRACT TO A 5/8 INCH DIAMETER REBAR ON THE EAST LINE OF SAID NORTHWEST QUARTER; THENCE NORTH 00 DEGREES 46 MINUTES 33 SECONDS EAST, 357.09 FEET ON AND ALONG THE EAST LINE OF SAID NORTHWEST QUARTER TO THE POINT OF BEGINNING CONTAINING 1.106 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A TRACT OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN DEKALB COUNTY, THE STATE OF INDIANA, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER MARKED BY A HARRISON MARKER FOUND THIS SURVEY; THENCE WEST (RECORD), ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 661.50 FEET TO THE PONT OF BEGINNING MARKED BY A REBAR SET THIS SURVEY AT THE NORTHWEST CORNER OF A TRACT OF LAND CONVEYED TO DAVID J. MILLER AND BETTY L. MILLER PER DEKALB COUNTY DEED RECORD BOOK 167, PAGE 319; THENCE CONTINUING WEST, ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 658.27 FEET TO THE NORTHWEST CORNER OF THE EAST HALF OF SAID NORTHWEST QUARTER MARKED BY A REBAR SET THIS SURVEY; THENCE SOUTH OO DEGREES 49 MINUTES 18 SECONDS WEST, ALONG THE WEST LINE OF THE EAST HALF OF SAID NORTHWEST QUARTER, FOR 357.09 FEET TO A REBAR SET THIS SURVEY, THENCE EAST, PARALLEL WITH THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 663.39 FEET TO A REBAR SET THIS SURVEY AT THE SOUTHWEST CORNER OF SAID TRACT CONVEYED TO MILLER; THENCE NORTH, ALONG THE WEST LINE OF SAID TRACT CONVEYED TO MILLER, FOR 357.05 FEET TO THE POINT OF BEGINNING, SAID TRACT CONTAINING 5.42 ACRES, MORE OR LESS.

CONTAINING AFTER SAID EXCEPTIONS, 49.179 ACRES, MORE OR LESS.

## PARCEL 3:

**AP NO. 15-07-35-200-005**
20.80 acres, more or less

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST IN DEKALB COUNTY, INDIANA.

EXCEPTING THEREFROM THE FORESTED 5.5 ACRES ON THE SOUTHERN BORDER OF THE PARCEL.

6

ALSO EXCEPTING THEREFROM:

A PART OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNTY, INDIANA, ANO BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 388.00 FEET ON ANO ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 100 DEGREES 48 MINUTES 33 SECONDS WEST, 357.09 FEET PARALLEL WITH THE WEST LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 59 MINUTES 37 SECONDS WEST, 366.00 FEET PARALLEL WITH THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR ON THE WEST LINE OF SAID NORTHEAST QUARTER; THENCE NORTH 00 DEGREES 48 MINUTES 33 SECONDS EAST, 357.09 FEET ON ANO ALONG THE WEST LINE OF SAID NORTHEAST QUARTER TO THE POINT OF BEGINNING, CONTAINING 3.000 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM, THE FOLLOWING DESCRIBED REAL ESTATE, TO-WIT;

A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL. WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

ALSO, SAVE AND EXCEPT 1.5 ACRES, MORE OR LESS, OUT OF THE MOST NORTHEASTERLY PORTION OF THIS PARCEL WHICH HAS BEEN DEVELOPED THEREON.

CONTAINING AFTER SAID EXCEPTIONS, 26.308 ACRES, MORE OR LESS.

## PARCEL 4:

**AP NO. 15-07-35-200-007**
1.00 acres, more or less

THE NORTHERN ONE (1) ACRE OF THE SOUTHERNMOST 6.02 ACRES OUT OF A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

EXHIBIT B.1 – SALE PROPERTY

**PARCEL 1:**

**PARCEL NO.: 17-07-35-100-004**
**2.00 acres, more or less**

**PARCEL 2:**

**PARCEL NO.: 17-07-35-100-003**
**2.30 acres, more or less**

**PARCEL 3:**

**PARCEL NO.: 17-07-35-200-007**
**3.19 acres, more or less**
THE MOST NORTHERLY 3.19 ACRES, MORE OR LESS, OF THE FOLLOWING DESCRIBED PARCEL:
 PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34)
NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND
BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35
MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST
(ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON
AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE
NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4)
MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION,
THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG
THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE
NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER
REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE
EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE
SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4)
MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST
300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST
QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS
EAST 1334.77 FEET PARALLEL WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID
NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS,

**PARCEL 4:**

**PARCEL NO.: 17-07-35-200-005**
**1.5 acres, more or less**
1.5 ACRES, MORE OR LESS, OUT OF THE MOST NORTHEASTERLY PORTION OF THE FOLLOWING
DESCRIBED PARCEL:

 A PART OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND
PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNTY, INDIANA, ANO BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

*9*

BEGINNING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 388.00 FEET ON ANO ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 100 DEGREES 48 MINUTES 33 SECONDS WEST, 357.09 FEET PARALLEL WITH THE WEST LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 59 MINUTES 37 SECONDS WEST, 366.00 FEET PARALLEL WITH THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR ON THE WEST LINE OF SAID NORTHEAST QUARTER; THENCE NORTH 00 DEGREES 48 MINUTES 33 SECONDS EAST, 357.09 FEET ON ANO ALONG THE WEST LINE OF SAID NORTHEAST QUARTER TO THE POINT OF BEGINNING, CONTAINING 3.000 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM, THE FOLLOWING DESCRIBED REAL ESTATE, TO-WIT;

A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL. WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

## PARCEL 5:

**PARCEL NO.: 17-07-35-100-008**
5.42 acres, more or less

A TRACT OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN DEKALB COUNTY, THE STATE OF INDIANA, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER MARKED BY A HARRISON MARKER FOUND THIS SURVEY; THENCE WEST (RECORD), ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 661.50 FEET TO THE PONT OF BEGINNING MARKED BY A REBAR SET THIS SURVEY AT THE NORTHWEST CORNER OF A TRACT OF LAND CONVEYED TO DAVID J. MILLER AND BETTY L. MILLER PER DEKALB COUNTY DEED RECORD BOOK 167, PAGE 319; THENCE CONTINUING WEST, ALONG THE NORTH

LINE OF SAID NORTHWEST QUARTER, FOR 658.27 FEET TO THE NORTHWEST CORNER OF THE EAST HALF OF SAID NORTHWEST QUARTER MARKED BY A REBAR SET THIS SURVEY; THENCE SOUTH OO DEGREES 49 MINUTES 18 SECONDS WEST, ALONG THE WEST LINE OF THE EAST HALF OF SAID NORTHWEST QUARTER, FOR 357.09 FEET TO A REBAR SET THIS SURVEY, THENCE EAST, PARALLEL WITH THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 663.39 FEET TO A REBAR SET THIS SURVEY AT THE SOUTHWEST CORNER OF SAID TRACT CONVEYED TO MILLER; THENCE NORTH, ALONG THE WEST LINE OF SAID TRACT CONVEYED TO MILLER, FOR 357.05 FEET TO THE POINT OF BEGINNING, SAID TRACT CONTAINING 5.42 ACRES, MORE OR LESS.

**17D02-2301-PL-000001**
DeKalb Superior Court 2

Filed: 1/3/2023 11:05 AM
Clerk
DeKalb County, Indiana

USDC IN/ND case 1:23-cv-00053-HAB-SLC    document 6    filed 01/03/23    page 57 of 75

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

THALASSA Energy Project
c/o 7X USA, LLC
3809 Juniper Trace, #100
Austin, TX  78738

## MEMORANDUM OF LEASE AGREEMENT

THIS MEMORANDUM OF LEASE AGREEMENT (the "*Memorandum*"), is entered into by and between ISS Land Management LLC (the "Owner") whose address is 6688 CR 44, Butler, IN  46721 and THALASSA Energy Project, LLC, a Texas limited liability company ("**Lessee**") whose address is 3809 Juniper Trace, Suite, 100, Austin, Texas, 78738.  Owner and Lessee shall sometimes be referred to herein individually as a "Party" and collectively as the "Parties".

1.  Owner and Lessee entered into a Lease Agreement dated April __22__, 2021 (the "Lease") that is effective as of the same date, which Owner by its terms leased and granted to Lessee certain rights and interests in the land located in DeKalb County, State of Indiana, described in Exhibit A attached hereto and incorporated by this reference (the "**Property**") for solar energy purposes, including, without limitation, solar resource evaluation, solar energy development, converting solar energy into electrical energy, collecting and transmitting the electrical energy converted from solar energy, energy storage purposes, and electric power, heat and/or steam generation, and any and all other activities related to the foregoing and to convert all of the solar resources of the Property, together with any and all activities related thereto, including, without limitation, constructing, installing, using, replacing, relocating and removing from time to time, and maintaining and operating Solar Facilities.

    "Solar Facilities" means energy collection and electrical generating and storage equipment of all types including, without limitation, any such equipment utilizing photovoltaic, energy storage, and/or solar thermal technology, overhead and underground electrical and communications lines, electric transformers, telecommunications equipment, roads, meteorological towers and solar energy measurement and storage equipment, control buildings, operations and maintenance buildings, maintenance yards, substations, switchyards, and related facilities and equipment.

2.  Owner has granted to Lessee as of the effective date of the Lease the right of access on, over and across the Property for ingress and egress to and from its Solar Facilities and appurtenant equipment and electrical power lines whether located on the Property or elsewhere and such additional areas of the Property as shall be reasonably necessary to access a public roadway.

3.  Owner shall not (and shall not allow any other party to) disturb or interfere with the unobstructed flow of solar energy upon, over and across the Property, whether by placing towers or antennas of any type, planting trees or constructing buildings or other structures or facilities, or by engaging in any other activity on the Property or any real property adjacent to the Property that is owned or controlled by Owner, if any (the "**Remainder Property**") that might delay the installation of,

**Exhibit B**

1

disrupt, or otherwise cause a decrease in the output or efficiency of the Solar Facilities. In furtherance thereof, Owner hereby grants and conveys to Lessee and its successors and assigns the exclusive easement to the free and unobstructed insolation of solar energy on, about, above, under, through and across the Property, including over the entirety of the horizontal space and the entirety of the vertical space lying above the surface of the Property and that portion of any Remainder Property contiguously situated around the Property (if any) for the benefit of the Property; provided Owner shall have the continued right to use the Remainder Property for any uses existing as of the Effective Date and any new uses which are wholly consistent with the Lease.

4. The initial term of the Lease is thirty-five (35) years from the date that the Solar Facilities commence to generate power, subject to the terms and provisions contained therein. Lessee has also been granted an option to extend the initial term for three (3) additional five (5) year periods, subject to the terms of the Lease.

5. The Solar Facilities shall not be deemed a fixture. The Solar Facilities are Lessee's personal property and Owner has no right, title or interest in the Solar Facilities.

6. Owner will not conduct activities on, in or about the Property that have a reasonable likelihood of causing material damage, impairment or otherwise materially adversely affecting the evaluation, investigation, construction, installation, maintenance, or operation of the Solar Facilities and/or Lessee's rights granted hereunder. After the Effective Date, other than with respect to a lien (mortgage or otherwise) complying with the Lease, Owner shall not without the prior written consent of Lessee voluntarily create or acquiesce in the creation of any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters or other exception to title to the Property, and Owner shall not create or suffer any monetary lien or encumbrance against the Property.

7. The Property shall be subject to the provisions set forth in the Agreement and herein, which provisions shall run with the Property and shall be binding upon and inure to the benefit of the parties and each other person and entity having any interest therein during the term of the Agreement and their respective heirs, successors and assigns.

8. All of the terms, conditions, provisions and covenants of the Lease are hereby incorporated into this Memorandum by reference as though fully set forth herein. This Memorandum does not supersede or modify the provisions of the Agreement. Should there be an inconsistency between the terms of this Memorandum and the Agreement, the terms of the Lease shall control. Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the Lease.

9. This Memorandum and the Agreement are governed by Indiana law.

**SIGNATURE PAGES TO FOLLOW**

*2*

**IN WITNESS WHEREOF**, the parties have executed this Memorandum as of the day and year first written above.

> **OWNER**
> **ISS Land Management LLC**
>
> By: _Timothy A Hill, owner_ _____
> Timothy A. Hill, Owner

State of INDIANA        }
                        }
County of DeKALB        }

I, the undersigned Notary Public, hereby certify that Timothy A. Hill, as Owner of ISS Land Management LLC, whose name is signed to the foregoing conveyance, and who is known to me or proved to me on the basis of satisfactory evidence, acknowledged before me on this day that, being informed of the contents of the conveyance, he/she executed the same voluntarily on the day the same bears date.

Given under my hand this 23rd day of April, 2021.

(Seal)

<br>

(Notary seal: NOTARY PUBLIC SEAL INDIANA)

**TERI L. KUGLER, Notary Public**
**Noble County, State of Indiana**
**My Commission Expires October 13, 2021**
**Commission Number: 648237**

Notary Public
My Commission Expires: 10-13-2021

3

**LESSEE**
**THALASSA Energy Project, LLC**
a Texas limited liability company


By: _____
    Clay Butler
    President


STATE OF TEXAS          §
                        §
COUNTY OF TRAVIS        §


        This instrument was acknowledged before me by Clay Butler, as President of Thalassa Energy Project LLC, a Texas limited liability company, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expresses.

        Given under my hand and seal this 22 day of April, 2021.


                                        _____
                                        Notary Public

Tami Clare
My Commission Expires
03/01/2024
ID No. 128903481

                                        My Commission Expires: 3·1·24

*4*

## EXHIBIT A

All that real property situated in DeKalb County, State of Indiana, described as follows:

## PARCEL 1:

**PARCEL NOS.:  17-07-35-100-007**
              **17-07-35-200-006**
              3.64 acres, more or less

LOTS NUMBERED ONE (L) AND TWO (2) IN M AND J ESTATES, A SUBDIVISION TO DEKALB COUNTY, INDIANA, ACCORDING TO THE PLAT THEREOF, RECORDED AS DOCUMENT #20901122 IN THE OFFICE OF THE RECORDER OF DEKALB COUNTY, INDIANA. CONTAINING 3.64 ACRES, MORE OR LESS.

## PARCEL 2:

**AP NO. 15-07-35-100-005**
36.679 acres, more or less

THE NORTH THREE FOURTHS OF THE EAST ONE-HALF OF THE NORTHWEST QUARTER OF SECTION THIRTY-FIVE (35) TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST IN DEKALB COUNTY, INDIANA.

SAVE AND EXPECT APROXIMATELY 12.5 ACRES, BEING THE FORESTED PORTION OF THE PARCEL;

AND EXCEPTING THE FOLLOWING DESCRIBED TRACT OF LAND:

BEGINNING AT A POINT ON THE NORTH LINE OF SAID SECTION 35 AND 137.5 FEET WEST OF THE NORTH QUARTER (1/4) CORNER OF SAID SECTION 35, THENCE SOUTH PERPENDICULAR TO SAID NORTH LINE OF SAID SECTION 357.05 FEET; THENCE WEST PARALLEL WITH THE SAID NORTH LINE OF SAID SECTION 244 FEET; THENCE NORTH 357.05 FEET PERPENDICULAR TO THE LAST DESCRIBED LINE TO SAID NORTH LINE OF SAID SECTION; THENCE EAST 244 FEET ON SAID NORTH LINE OF SAID SECTION TO THE POINT OF BEGINNING AND ENCLOSING AN AREA OF 2.00 ACRES MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A PARCEL OF LAND SITUATED IN A PART OF THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN WILMINGTON TOWNSHIP, DEKALB COUNTY, INDIANA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 35; THENCE WEST BEARING ASSUMED ALONG THE NORTH LINE THEREOF 381.5 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 357.05 FEET TO AN IRON STAKE; THENCE WEST PARALLEL WITH SAID NORTH LINE OF SECTION 35 DISTANCE OF 280.0 FEET TO AN IRON STAKE; THENCE NORTH 357.05 FEET TO A RAILROAD SPIKE ON SAID NORTH LINE OF THE NORTHWEST QUARTER OF SECTION 35; THENCE EAST ALONG SAID NORTH LINE 280.0 FEET TO THE POINT OF BEGINNING. CONTAINING 2.295 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A PART OF THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNIY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 90 DEGREES OO MINUTES OO SECONDS WEST (ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 137.50 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER TO THE NORTHEAST CORNER OF A TRACT OF REAL ESTATE CONVEYED BY GEORGE TITTLE AND ANN TITLE TO DAVID J. MILLER AND BETTY L. MILLER IN WARRANTY DEED DATED MAY 23, 1978 AND RECORDED IN DEKALB COUNTY, INDIANA RECORDER'S OFFICE IN DEED RECORD 167 AT PAGE 318, SAID CORNER MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH OO DEGREES OO MINUTES OO SECONDS WEST, 357.05 FEET ON AND ALONG THE EAST LINE OF SAID MILLER TRACT TO THE SOUTHEAST CORNER OF SAID MILLER TRACT MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 90 DEGREES OO MINUTES OO SECONDS EAST, 132.46 FEET ON AND ALONG THE EXTENDED SOUTH LINE OF SAID MILLER TRACT TO A 5/8 INCH DIAMETER REBAR ON THE EAST LINE OF SAID NORTHWEST QUARTER; THENCE NORTH 00 DEGREES 46 MINUTES 33 SECONDS EAST, 357.09 FEET ON AND ALONG THE EAST LINE OF SAID NORTHWEST QUARTER TO THE POINT OF BEGINNING CONTAINING 1.106 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM:

A TRACT OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN DEKALB COUNTY, THE STATE OF INDIANA, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER MARKED BY A HARRISON MARKER FOUND THIS SURVEY; THENCE WEST (RECORD), ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 661.50 FEET TO THE PONT OF BEGINNING MARKED BY A REBAR SET THIS SURVEY AT THE NORTHWEST CORNER OF A TRACT OF LAND CONVEYED TO DAVID J. MILLER AND BETTY L. MILLER PER DEKALB COUNTY DEED RECORD BOOK 167, PAGE 319; THENCE CONTINUING WEST, ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 658.27 FEET TO THE NORTHWEST CORNER OF THE EAST HALF OF SAID NORTHWEST QUARTER MARKED BY A REBAR SET THIS SURVEY; THENCE SOUTH OO DEGREES 49 MINUTES 18 SECONDS WEST, ALONG THE WEST LINE OF THE EAST HALF OF SAID NORTHWEST QUARTER, FOR 357.09 FEET TO A REBAR SET THIS SURVEY, THENCE EAST, PARALLEL WITH THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 663.39 FEET TO A REBAR SET THIS SURVEY AT THE SOUTHWEST CORNER OF SAID TRACT CONVEYED TO MILLER; THENCE NORTH, ALONG THE WEST LINE OF SAID TRACT CONVEYED TO MILLER, FOR 357.05 FEET TO THE POINT OF BEGINNING, SAID TRACT CONTAINING 5.42 ACRES, MORE OR LESS.

CONTAINING AFTER SAID EXCEPTIONS, 49.179 ACRES, MORE OR LESS.

### PARCEL 3:

**AP NO. 15-07-35-200-005**
20.80 acres, more or less

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST IN DEKALB COUNTY, INDIANA.

EXCEPTING THEREFROM THE FORESTED 5.5 ACRES ON THE SOUTHERN BORDER OF THE PARCEL.

ALSO EXCEPTING THEREFROM:

A PART OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNTY, INDIANA, ANO BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 388.00 FEET ON ANO ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 100 DEGREES 48 MINUTES 33 SECONDS WEST, 357.09 FEET PARALLEL WITH THE WEST LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 59 MINUTES 37 SECONDS WEST, 366.00 FEET PARALLEL WITH THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR ON THE WEST LINE OF SAID NORTHEAST QUARTER; THENCE NORTH 00 DEGREES 48 MINUTES 33 SECONDS EAST, 357.09 FEET ON ANO ALONG THE WEST LINE OF SAID NORTHEAST QUARTER TO THE POINT OF BEGINNING, CONTAINING 3.000 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM, THE FOLLOWING DESCRIBED REAL ESTATE, TO-WIT;

A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL. WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

ALSO, SAVE AND EXCEPT 1.5 ACRES, MORE OR LESS, OUT OF THE MOST NORTHEASTERLY PORTION OF THIS PARCEL WHICH HAS BEEN DEVELOPED THEREON.

CONTAINING AFTER SAID EXCEPTIONS, 26.308 ACRES, MORE OR LESS.

**PARCEL 4:**

**AP NO. 15-07-35-200-007**
1.00 acres, more or less

THE NORTHERN ONE (1) ACRE OF THE SOUTHERNMOST 6.02 ACRES OUT OF A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

EXHIBIT B.1 – SALE PROPERTY

**PARCEL 1:**

**PARCEL NO.: 17-07-35-100-004**
**2.00 acres, more or less**

**PARCEL 2:**

**PARCEL NO.: 17-07-35-100-003**
**2.30 acres, more or less**

**PARCEL 3:**

**PARCEL NO.: 17-07-35-200-007**
**3.19 acres, more or less**
THE MOST NORTHERLY 3.19 ACRES, MORE OR LESS, OF THE FOLLOWING DESCRIBED PARCEL:
PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34)
NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND
BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35
MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST
(ASSUMED BEARING AND BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON
AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE
NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4)
MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION,
THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG
THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE
NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER
REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE
EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE
SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4)
MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST
300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST
QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS
EAST 1334.77 FEET PARALLEL WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID
NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS,

**PARCEL 4:**

**PARCEL NO.: 17-07-35-200-005**
**1.5 acres, more or less**
1.5 ACRES, MORE OR LESS, OUT OF THE MOST NORTHEASTERLY PORTION OF THE FOLLOWING
DESCRIBED PARCEL:

A PART OF THE NORTHEAST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, SECOND
PRINCIPAL MERIDIAN, WILMINGTON CIVIL TOWNSHIP, DEKALB COUNTY, INDIANA, ANO BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION), 388.00 FEET ON ANO ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 100 DEGREES 48 MINUTES 33 SECONDS WEST, 357.09 FEET PARALLEL WITH THE WEST LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 59 MINUTES 37 SECONDS WEST, 366.00 FEET PARALLEL WITH THE NORTH LINE OF SAID NORTHEAST QUARTER TO A 5/8 INCH DIAMETER REBAR ON THE WEST LINE OF SAID NORTHEAST QUARTER; THENCE NORTH 00 DEGREES 48 MINUTES 33 SECONDS EAST, 357.09 FEET ON ANO ALONG THE WEST LINE OF SAID NORTHEAST QUARTER TO THE POINT OF BEGINNING, CONTAINING 3.000 ACRES, MORE OR LESS.

ALSO EXCEPTING THEREFROM, THE FOLLOWING DESCRIBED REAL ESTATE, TO-WIT;

A PART OF THE NORTHEAST QUARTER (1/4) OF SECTION THIRTY-FIVE (35), TOWNSHIP THIRTY-FOUR (34) NORTH, RANGE FOURTEEN (14) EAST, SECOND PRINCIPAL MERIDIAN, DEKALB COUNTY, INDIANA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER (1/4) OF SAID SECTION 35 MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST (ASSUMED BEARING ANO BASIS OF ALL BEARINGS TO FOLLOW IN THIS DESCRIPTION) 994.35 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO A POINT 300.00 FEET FROM THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR AND THE POINT OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUING NORTH 89 DEGREES 59 MINUTES 37 SECONDS EAST 300.00 FEET ON AND ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER (1/4) TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 00 DEGREES 31 MINUTES 58 SECONDS WEST 1334.60 FEET ON AND ALONG THE EAST LINE OF THE NORTHWEST; QUARTER (1/4) OF THE SAID NORTHEAST QUARTER (1/4) TO THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) MARKED BY A 5/8 INCH DIAMETER REBAR; THENCE SOUTH 89 DEGREES 57 MINUTES 45 SECONDS WEST 300.00 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO A 5/8 INCH DIAMETER REBAR; THENCE NORTH 00 DEGREES 31 MINUTES 58 SECONDS EAST 1334.77 FEET PARALLEL. WITH THE EAST LINE OF THE NORTHWEST QUARTER (1/4) OF SAID NORTHEAST QUARTER (1/4) TO THE POINT OF BEGINNING, CONTAINING 9.192 ACRES, MORE OR LESS.

### PARCEL 5:

**PARCEL NO.: 17-07-35-100-008**
5.42 acres, more or less

A TRACT OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 35, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN DEKALB COUNTY, THE STATE OF INDIANA, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER MARKED BY A HARRISON MARKER FOUND THIS SURVEY; THENCE WEST (RECORD), ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 661.50 FEET TO THE PONT OF BEGINNING MARKED BY A REBAR SET THIS SURVEY AT THE NORTHWEST CORNER OF A TRACT OF LAND CONVEYED TO DAVID J. MILLER AND BETTY L. MILLER PER DEKALB COUNTY DEED RECORD BOOK 167, PAGE 319; THENCE CONTINUING WEST, ALONG THE NORTH

LINE OF SAID NORTHWEST QUARTER, FOR 658.27 FEET TO THE NORTHWEST CORNER OF THE EAST HALF OF SAID NORTHWEST QUARTER MARKED BY A REBAR SET THIS SURVEY; THENCE SOUTH OO DEGREES 49 MINUTES 18 SECONDS WEST, ALONG THE WEST LINE OF THE EAST HALF OF SAID NORTHWEST QUARTER, FOR 357.09 FEET TO A REBAR SET THIS SURVEY, THENCE EAST, PARALLEL WITH THE NORTH LINE OF SAID NORTHWEST QUARTER, FOR 663.39 FEET TO A REBAR SET THIS SURVEY AT THE SOUTHWEST CORNER OF SAID TRACT CONVEYED TO MILLER; THENCE NORTH, ALONG THE WEST LINE OF SAID TRACT CONVEYED TO MILLER, FOR 357.05 FEET TO THE POINT OF BEGINNING, SAID TRACT CONTAINING 5.42 ACRES, MORE OR LESS.

ANDREW D. KRUSE
andrewkruse@kruselaw.com



*DAVID A KRUSE, retired 2020*
*DERALD D. KRUSE 1944-2006*

**KRUSE & KRUSE P.C.**
*Attorneys at Law*
143 E. NINTH STREET
AUBURN, INDIANA 46706
TELEPHONE 260-925-0200
FACSIMILE 260-925-1228

March 2, 2022

Thalassa Energy Project, LLC
3809 Juniper Trace, Suite 100
Austin, TX 78738

Lightsource bp
3809 Juniper Trace, Suite 100
Austin, TX 78738

Lightsource bp
400 Montgomery Street,
8th Floor
San Francisco, CA 94104

Certified Mail:
7019 0700 0001 9593 4593
9590 9402 5442 9189 0173 30

Certified Mail:
7019 0700 0001 9593 4609
9590 9402 5442 9189 0173 23

Certified Mail:
7019 0700 0001 9593 4616
9590 9402 5442 9189 0173 16

Re:     ISS Land Management, LLC, Andy Hill

To Whom It May Concern:

On April 22, 2021, ISS Land Management, LLC by Timothy A. Hill, owner, and Thalassa Energy Project, LLC, by Clay Butler, President, lessee, entered into a Lease and Purchase Agreement. A Memorandum of Lease Agreement was recorded on May 12, 2021 as Document #202103428 with the Recorder of DeKalb County, Indiana.

The deadline for the Lessee to purchase the property has past, therefore the contract is terminated and the lease is also terminated.

We ask that you record a document terminating the lease and memorandum of lease that was recorded.

If you fail to do this, ISS Land Management, LLC may be forced to file a declaratory judgment action and/or an action to quiet title

Sincerely,

Kruse & Kruse P.C.

Andrew D. Kruse
ADK/rc
andrewkruse@kruselaw.com
21-65

**Exhibit C**

**ANDREW D. KRUSE**
andrewkruse@kruselaw.com



*DAVID A KRUSE, retired 2020*
*DERALD D. KRUSE 1944-2006*

**KRUSE & KRUSE P.C.**
*Attorneys at Law*
143 E. NINTH STREET
AUBURN, INDIANA 46706
TELEPHONE 260-925-0200
FACSIMILE 260-925-1228

April 14, 2022

Javier Fuentes
Vice President
Thalassa Energy Project, LLC
201 Helios Way, 3rd Floor
Houston, TX 77079

Re:    ISS Land Management, LLC, Andy Hill

Dear Mr. Fuentes:

There has been no recent negotiations, nor was any deal put together in January.

We assume that you are referring to the various "amendments" that your company was trying to get my client to sign in January. My client did not agree to the terms in the documents, and therefore those documents were not signed by my client.  If you believe that you have a signed document from January please forward a copy to my office.

I do not believe that there are any documents signed by both parties extending the timeframe of the original agreement.

Therefore the first option to purchase from the original agreement is not enforceable.  If you have any signed document that states the first option is still in force, please forward a copy to my office.

The initial agreement terminated by its own language.

Your attempt to continue the enforceability of the agreement beyond its stated termination date is not acceptable.

The property is listed for sale.  You can contact the listing agent and make an offer through them if you so choose.

Sincerely,

Kruse & Kruse P.C.


Andrew D. Kruse
ADK/rc
andrewkruse@kruselaw.com
21-65

DAVID A. KRUSE ret.                                                    *DERALD D. KRUSE*
ANDREW D. KRUSE                                                        1944-2006



**KRUSE & KRUSE P.C.**
*Attorneys at Law*
143 E. NINTH STREET
AUBURN, INDIANA 46706
TELEPHONE 260-925-0200
FACSIMILE 260-925-1228

May 23, 2022

Eric Skanchy
Light Source BP
Senior Legal Counsel

RE: ISS Land Management, LLC

Dear Mr. Skanchy:

I represent ISS Land Management, LLC. I saw your email claiming a first right of refusal under the Lease with ISS Land Management, LLC. It is the position of ISS Land Management, LLC that the lease is terminated – including the paragraph on first right of refusal in Section 20.8. The offer of $1,700,000 to purchase the real estate is rejected. The real estate is listed through Century 21 and is listed at $4,200,000.

Sincerely,

**Kruse & Kruse P.C.**

Andrew D. Kruse

AK
cc: file, client, Century 21

ANDREW D. KRUSE
andrewkruse@kruselaw.com

*DAVID A KRUSE, retired 2020*
*DERALD D. KRUSE 1944-2006*

**KRUSE & KRUSE P.C.**
*Attorneys at Law*
143 E. NINTH STREET
AUBURN, INDIANA 46706
TELEPHONE 260-925-0200
FACSIMILE 260-925-1228

November 1, 2022

Thalassa Energy Project, LLC
3809 Juniper Trace, Suite 100
Austin, TX 78738

Lightsource bp
400 Montgomery Street,
8th Floor
San Francisco, CA 94104

Re:    ISS Land Management, LLC, Andy Hill

To Whom It May Concern:

On April 22, 2021, ISS Land Management, LLC by Timothy A. Hill, owner, and Thalassa Energy Project, LLC, by Clay Butler, President, lessee, entered into a Lease and Purchase Agreement. A Memorandum of Lease Agreement was recorded on May 12, 2021 as Document #202103428 with the Recorder of DeKalb County, Indiana.

The deadline for the Lessee to purchase the property has past; therefore the contract and lease are terminated.

Since the Memorandum of Lease was recorded we ask that you sign the enclosed Cancelation of Lease Agreement and return it to our office so that we can record it.

If you fail to do this, ISS Land Management, LLC may be forced to file a declaratory judgment action and/or an action to quiet title

Sincerely,

Kruse & Kruse P.C.

Andrew D. Kruse
ADK/rc
andrewkruse@kruselaw.com
21-65

# CANCELATION OF LEASE AGREEMENT

**THIS AGREEMENT** is made and entered into by and between Owner, **ISS Land Management, LLC by Timothy A. Hill, owner**, and Lessee, **Thalassa Energy Project, LLC, by Clay Butler, President.**

**WITNESSETH:**

**WHEREAS,** Owner and Lessee executed a Lease and Purchase Agreement for real estate described as follows:

See Exhibit A and Exhibit B-1 attached hereto for reference

which Lease was executed on the 22nd day of April, 2021; and a Memorandum of Lease Agreement was recorded on May 12, 2021 as Document #202103428; and

**WHEREAS,** Owner and Lessee mutually desire to cancel said Lease and Purchase Agreement; and

**WHEREAS,** the parties desire to cancel the Lease and Purchase Agreement and release the said Lessee from any obligation to pay anything further under said Lease and Purchase Agreement and to give unto the said Owner any and all rights, claims, or interests that the said Lessee may have in and to said Lease and Purchase Agreement made the subject of said Lease and Purchase Agreement;

**NOW, THEREFORE,** in consideration of the mutual premises herein, it is hereby agreed by the parties as follows:

1. Lessee hereby releases, quit-claims, and divest themselves of any interest in and to said real estate and assets described above, and hereby cancels, rescinds, and quit-claims any

1

interest that they might have or could have under said Lease and Purchase Agreement. The said Lessee herewith gives and quit-claims any and all rights to possession of said real estate to the said Owner, the legal owner, and Lessee agrees to sign a quit-claim deed to effectuate the cancellation of record.

2. The Lessee represents and warrants that they have not assigned, sold, or pledged said Lease and Purchase Agreement to any other person, nor have they encumbered, sold, or disposed of the real estate made the subject of said Lease and Purchase Agreement.

3. Owner is responsible for the real estate taxes.

4. Owner shall be able to keep all rent and/or proceeds of any type that Owner has received from Lessee throughout the term of this lease.

4. The Owner, in consideration for the cancellation of said Lease and Purchase Agreement by the said Lessee, hereby forgives and releases any and all claims that he may or could have under said Lease and Purchase Agreement against Lessee.

5. The effective date of the surrender of all rights and property by Lessee to Owner is____ _____.

**IN WITNESS WHEREOF,** the parties have executed this agreement on this _____ day of _____, 2022.

**Owner:**                                      **Buyer:**


_____          _____
**ISS Land Management, LLC**              **Thalassa Energy Project, LLC**
**by Timothy A. Hill**                    **Clay Butler, President**

2

STATE OF_____)
                                               )SS:
COUNTY OF_____)

      Subscribed and sworn to before me, a Notary Public, this _____ day of _____, 2022, by **Timothy A. Hill, owner of ISS Land Management, LLC.**

My commission number:

_____

My expiration date:

_____
                  _____
                  Notary Public

                  _____
                  Printed name of notary

STATE OF_____)
                                               )SS:
COUNTY OF_____)

      Subscribed and sworn to before me, a Notary Public, this _____ day of _____, 2022, by **Clay Butler, President, Thalassa Energy Project, LLC.**

My commission number:

_____

My expiration date:

_____
                  _____
                  Notary Public

                  _____
                  Printed name of notary

3

Owner's address: ISS Land Management LLC, 6688 County Road 44, Butler, IN 46721


I affirm, under the penalties for perjury, that I have taken reasonable care to redact each social security number in this document, unless required by law.   Andrew D. Kruse


PREPARED BY:  Andrew D. Kruse, #23555-17, KRUSE & KRUSE, PC, Attorneys at Law, 143 East Ninth Street, Auburn, Indiana 46706, Phone: 260-925-0200, Attorney for Owner.

**4**